[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 755 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 756 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 757 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 758 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 759 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 760 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 761 
The appellant, Marcus Bernard Williams, was convicted of capital murder for the killing of Melanie Dawn Rowell. The murder was made capital because the appellant committed it during a rape or an attempted rape. See § 13A-5-40(a)(3), Ala. Code 1975. After a sentencing hearing, the jury recommended, by a vote of 11-1, that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death by electrocution.
The trial court prepared the following summary of the relevant facts of this case:
 "On November 6th, 1996, the defendant had been out with friends, drinking and smoking marijuana. Upon returning home that evening, the defendant's thoughts turned to a young female neighbor of his, Melanie Dawn Rowell, and his desire to have sexual relations with her.
 "At approximately 1:00 a.m. that night, Williams attempted to enter Rowell's back door, but the door was locked. He then noticed a kitchen window beside the door. He removed the screen from the window and found that the window was not locked. It was through that window that Williams obtained entrance to the apartment.
 "Williams proceeded through the kitchen to the stairs leading to the upstairs bedroom. Before exiting the kitchen, Williams removed a knife from a set of knives in a holder on a kitchen countertop. Part way up the stairs, knife in hand, Williams removed his pants. Upon reaching the upstairs area, Williams crossed over a `baby gate' which protected Rowell's two children, ages 15 months and 2 years, from the stairs. Williams looked into the children's room and found them both asleep.
 "Williams then entered the room of Melanie Rowell. He climbed in bed on top of her. When he began removing Rowell's clothes, a struggle ensued. Rowell *Page 762 
fought Williams and began screaming despite [his] being armed with a knife. Williams placed his hand over her mouth to silence her and once again attempted to remove her clothes. As Rowell continued to struggle, Williams placed his hands around her neck. Eventually Rowell ceased to struggle as Williams continued to strangle her. When she was motionless, Williams proceeded to have sexual intercourse with her for 15 to 20 minutes. Prior to ejaculation, Williams pulled out and ejaculated on Rowell's stomach. There was a small cut inflicted upon Rowell's throat that was determined to be post-mortem. The cause of death was asphyxia due to strangulation.
 "As he left Rowell's apartment, Williams took her purse. According to his statement, he threw the purse and the knife into a dumpster outside the apartment, although a search of the dumpster the next day by law enforcement failed to find either.
 "The defendant was subsequently arrested after being identified by the elderly female victim in a subsequent break-in in the Ashville area. Upon being taken into custody for that offense, the defendant gave a statement admitting his involvement in the death of Melanie Rowell."
(C.R. 105-07.) Additional facts are included, as necessary, throughout this opinion.
In his brief, the appellant raises several issues that he did not first present to the trial court. His failure to object will not bar our review of an issue in a case involving the death penalty. However, it will weigh against any claim of prejudice he may allege. See Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review . . . whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046,84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163,102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 n. 14 (1982)).
 I.
The appellant's first argument is that the trial court erred by not allowing the defense to perform independent DNA tests on blood samples taken from other suspects. (Issue I in the appellant's brief to this court.) At a pretrial hearing, the State indicated that, during the course of the investigation in this case, law enforcement officials had gathered blood samples from approximately 14 other suspects and had had DNA tests performed on those samples. The appellant requested funds to perform an independent analysis of each of those samples. The trial court granted the defense's request for funds to have independent tests performed on his own blood, but denied the request to independently test the samples from the other suspects. The trial court explained its ruling as follows:
 "I will allow you to re-run the matching sample of the defendant to the sample found on the victim. I don't believe I'm going to let you run all the other potential samples unless you show me some strong evidence. Normally, evidence that another person may have committed the offense is not admissible in the defense of an individual." *Page 763 
(R. 9.) The appellant did not subsequently present this request to the trial court again.
 "In [Ex parte] Moody, [684 So.2d 114 (Ala. 1996),] the Alabama Supreme Court defined the standard by which a trial court must assess an indigent defendant's request for expert assistance.
 "`Although the [United States] Supreme Court has not specifically stated what "threshold showing" must be made by the indigent defendant with regard to the need for an expert, the Court refused to require the state to pay for certain experts when the indigent defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472, U.S. 320 at 323, 105[,] S.Ct. 2633 at 2637, 86 L.Ed.2d 231 (1985). As we stated in Dubose [v. State, 662 So.2d 1189 (Ala. 1995)] the Supreme Court cases of Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)] and Caldwell, viewed together, seem to hold that an indigent defendant must show more than a mere possibility that an expert would aid in his defense. "Rather, the defendant must show a reasonable probability that an expert would aid in his defense and [must show that] a denial of an expert to assist at trial would result in a fundamentally unfair trial." Dubose, 662 So.2d at 1192, citing Moore v. Kemp, 809 F.2d 702
(11th Cir.), cert. denied, 481 U.S. 1054, 107 S. Ct. 2192, 95 L.Ed.2d 847 (1987).
"`. . . .
 "`Based on the foregoing, we conclude that for an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense.'
 "684 So.2d at 199. See also Burgess v. State, [723] So.2d [742] (Ala.Cr.App. 1997); MacEwan v. State, 701 So.2d 66 (Ala.Cr.App. 1997); Ex parte Dobyne, 672 So.2d 1354, 1357 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670
(1996)."
Finch v. State, 715 So.2d 906, 910-11 (Ala.Cr.App. 1997). In this case, the trial court gave the appellant an opportunity to make such a showing, but the appellant did not satisfy his burden of proof. After independently testing his own blood, he did not show that there was a reasonable probability that independent DNA testing of the samples from the other suspects would aid his defense and that a denial of the opportunity to have independent DNA testing performed would result in a fundamentally unfair trial. He did not specifically show that independent testing was absolutely necessary to answer a substantial issue or question raised by the State or to support a critical element of the defense. In fact, throughout the trial, his defense was that he entered the victim's apartment with the intent to have sex with her, but that he did not intend to kill her. Therefore, the trial court did not err in denying the appellant's request to have the samples from the other suspects independently tested.
 II.
The appellant's second argument is that the trial court erroneously allowed the victim's mother to testify that the victim's *Page 764 
children were in the residence when she found the victim's body. (Issue II in the appellant's brief to this court.) Specifically, he contends that the trial court should have excluded the testimony because its probative value was substantially outweighed by its prejudicial effect on the jury. Prior to trial, the appellant filed a motion in limine to prevent any reference to the presence of the children at the crime scene. After jury selection, the trial court conducted an extensive hearing regarding the admissibility of such testimony. In denying the appellant's motion in limine, the trial court stated:
 "She can testify. We are not going into it and rehash it and delve into her emotional feelings or the child's emotional feelings. That has nothing to do with the case. As far as her being the first witness on the scene — that that is what she observed; that the presence of the child in the room may have some materiality concerning the evidence or what was there or what was not there. I don't think you can extricate that without, in effect, altering the testimony at trial. I don't think there is any way to conveniently leave that out, and still present truthful, competent evidence to the jury."
(R. 158-59.) After additional argument, the trial court further explained its ruling:
 "I don't think there is any way to remove this and present a coherent — I'm talking an honest and truthful portrait of the crime scene. I think to do otherwise would, in essence, be playing games with the jury. I mean taking what, in any other case, would be a crucial piece of evidence that the crime scene was disturbed and having an opportunity to be disturbed by another person between the time of the offense and the time the investigators got there, in any other case, that would be a huge piece of evidence that the defendant would be urging in. In this case, it just happens to be an 18-month-old child."
(R. 163.) In conclusion, the trial court said,
 "In that kind of situation, I think the jury has a right to know what happened to the crime scene between the time of the offense and the time the investigators got there. I think the fact the mother went into the crime scene. I don't find any way you could separate that. It may be prejudicial, but in order to preserve — I think the integrity of the trial itself and the witnesses. To require them to somehow excise a whole portion of the facts leading up to the investigation — as I say, I think it would be playing games with the jury doing that."
(R. 164.)
 "`A party who suffers an adverse ruling on a motion in limine can preserve the ruling for post-judgment and appellate review only by objecting to the introduction of the proffered evidence and assigning specific grounds at the time of trial, unless he or she obtains the express acquiescence of the trial judge that a subsequent objection and assignment of grounds are not necessary.'
 "Miles v. State, 650 So.2d 583, 586 (Ala.Cr.App. 1994), quoting, Parks v. State, 587 So.2d 1012
(Ala. 1991)."
Grimsley v. State, 678 So.2d 1197, 1208 (Ala.Cr.App. 1996) (emphasis in original). The appellant did not object during opening arguments when the State referred to the children's presence at the crime scene or during the State's case-in-chief when the State elicited testimony about the children's presence at the crime scene. Furthermore, the record does not reflect that the trial court agreed that a subsequent objection would not be necessary. Accordingly, *Page 765 
we review this issue under the plain error rule. See Rule 45A, Ala.R.App.P.
Under Rule 403, Ala. R. Evid., relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." (Emphasis added.) Furthermore, "[t]he power to make this determination is vested in the trial court. We will not disturb such a determination unless it is clearly an abuse of discretion." Hayes v. State, 717 So.2d 30, 37
(Ala.Cr.App. 1997) (citations omitted).
 "`Under the liberal test of admissibility in Alabama, "a fact is admissible if it has any probative value, however slight, upon a matter in the case." McElroy's § 21.01 at 34. "Evidence as to the scene of a crime, as to objects found thereat, and as to the condition of the body, is admissible and relevant evidence, when reasonably proximate to the scene in time and location." Petty v. State, 40 Ala. App. 151, 154, 110 So.2d 319, 322
(1958), cert. denied, 269 Ala. 48, 110 So.2d 325 (1959).' . . . .
"Parker v. State, 587 So.2d 1072, 1090 (Ala.Cr.App. 1991)."
Land v. State, 678 So.2d 201, 210 (Ala.Cr.App. 1995), aff'd,678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308,136 L.Ed.2d 224 (1996). Donna Rowell, the victim's mother, testified that she baby-sat the victim's children while the victim worked. The victim would take the children to Rowell's house around 11:30 a.m. on the days she worked. In the evening, Rowell would take the children back to the victim's apartment, put them to bed, and wait for the victim to return. Rowell testified that she had kept the victim's children on November 5, 1996, and that she left the victim's apartment around 11:15 p.m. According to Rowell, the victim was supposed to work on the following day, and Rowell became concerned when the victim did not bring the children to her house. Around 2:00 p.m., Rowell went to the victim's apartment to check on her. She testified as follows about what happened after she entered the apartment:
 "[Rowell]: I went up the stairs. When I got to the top, I had to crawl over the child's gate.
"[Prosecutor]: What is a child's gate?
 "[Rowell]: A gate to keep children from going down the stairs. She put it up every night so they wouldn't go down the stairs.
 "[Prosecutor]: So when you got up the stairs, you found the child's gate?
"[Rowell]: Yes, sir, and I had to step over it.
 "[Prosecutor]: What room did you go into then, Mrs. Rowell?
"[Rowell]: Melanie's.
 "[Rowell]: Can you tell us what you saw or did when you went into Melanie's room?
 "[Rowell]: I glanced in and at first I saw her little girl, Kirsten, sitting on the bed. As I walked closer, I could see some feet and legs lying on the other side of the bed on the floor. They were blue and white and straddled slightly. She didn't have any underwear on.
"[Prosecutor]: Did you go over to where she was?
 "[Rowell]: Yes, sir, I did. I knelt down and I had to touch her. I touched her on the shoulder. She was cold and hard.
"[Prosecutor]: She was cold?
"[Rowell]: And hard.
"[Prosecutor]: And hard?
 "[Rowell]: Yes, sir. I looked — she had her head turned slightly to the side and she had a cut across her neck.
"[Prosecutor]: What did you do then, Mrs. Rowell? *Page 766 
 "[Rowell]: I remember saying, `Oh, no, Dear God.' She was wearing a white, like a nightshirt with little blue teddy bears on it, and it was pulled up above her belly button. I had a cellular phone. I got it out of my purse and I couldn't use it.
"[Prosecutor]: You couldn't use it?
 "[Rowell]: No, sir. I knew there was not anything I could do for her at the time.
"[Prosecutor]: Was she alive, Mrs. Rowell?
"[Rowell]: No, sir, she was not.
"[Prosecutor]: How do you know?
 "[Rowell]: She was not breathing. She was hard and cold and blue and white. I picked up Kirsten and as I turned to go out, I didn't see her little boy, William. I started to worry. I called his name and he didn't answer. I got in the hall and I went in his room, which is directly across from Kirsten's. He was standing on the bed just staring at me. I picked him up and I carried them over the gate. I went downstairs. I don't know why, but I looked from her living room to the kitchen to see if her back door was locked, and it was. I took them out the front door and I went to a neighbor's and I asked her if she would help me call the police."
(R. 190-91.)
In a statement he made to law enforcement officers, the appellant said that the children were across the hallway during the rape and the murder and that they never woke up. He said that he had "peeked in" at the children before he went into the victim's room. Finally, the appellant also said that he had stepped over a "child gate" at the top of the stairs in the victim's apartment.
The testimony concerning the presence of the children was relevant to explain the condition of the crime scene when Rowell arrived and to explain why Rowell removed the child from the crime scene. This testimony was also relevant to explain what happened to the children after the appellant left the victim's home. Finally, the evidence was relevant because it corroborated details contained in the appellant's statements about the offense. Furthermore, the testimony was not unduly prejudicial. The testimony did not address the emotional state of the children and did not imply that the children had witnessed their mother being raped and murdered. Rather, Rowell simply described the crime scene as she found it and explained her actions after discovering her daughter's body. For the foregoing reasons, the trial court did not abuse its discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Therefore, we do not find any plain error in this regard.
 III.
The appellant's third argument is that the trial court erred in admitting into evidence three statements he contends law enforcement officers coerced him to make. (Issue III in the appellant's brief to this court.) During the suppression hearing, the appellant stated that Investigator Tommy Dixon told him things would be easier for him if he made a statement about his involvement in the offense. He also contended that Dixon promised to talk to the judge on his behalf if he made a statement. He explained that he took Dixon's statement to mean that he would receive a lighter sentence if he made a statement about his involvement in the offense. However, on cross-examination, the appellant admitted that the officers did not make any promises or threats and did not coerce him or force him to make the statements. He also admitted that Dixon did not tell him he would receive a lighter sentence if he made a statement. *Page 767 
Dixon testified that he did not tell the appellant that things would be better for him if he made a statement or worse for him if he did not. He also testified that he did not tell the appellant he would talk to the judge on his behalf. In addition, Investigator Randy Wall testified that, after the officers advised the appellant of his Miranda[1] rights, he waived his rights and agreed to talk to them about his involvement in the offense. He further testified that the officers did not make any promises, threats, or offers of benefits or rewards, and that they did not tell the appellant that things would be easier for him if he made a statement or worse for him if he did not make a statement. At the conclusion of the hearing, the trial court denied the appellant's motion to suppress his statements and allowed the State to admit them into evidence during the trial.
 "It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532 (1897). In Culombe [v. Connecticut], 367 U.S. [568] at 602, 81 S.Ct. [1860] at 1879 [(1961)], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
 "The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App. 1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859
(Ala.Crim.App. 1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added). Thus, to determine whether McLeod's confession was improperly induced, we must determine if his will was `overborne' by an implied promise of leniency.
 "Instead of applying the `overborne' test, the Court of Criminal Appeals applied a more stringent `bargained with' test. It held that because Officer Burch `bargained with' McLeod to obtain his confession — if McLeod cooperated, the police would make his cooperation known to the district attorney — the confession `was improperly induced by a promise made by Officer Burch that reasonably engendered a hope of favor in McLeod's mind.' McLeod, 718 So.2d at 727. We disagree. *Page 768 
 "In [Ex parte] Gaddy, 698 So.2d [1150] at 1154 [(Ala. 1997)], this Court expressly disapproved the `bargained with' test used by the Court of Criminal Appeals and held that a court should examine the totality of the circumstances to determine if an implied promise of leniency caused the defendant to make the confession — — i. e., if it overbore the will of the defendant. Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988)); Culombe, 367 U.S. at 602; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala.), cert. denied,524 U.S. 9289, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998) (footnote omitted) (emphasis in original). Also,
 "we note that the mere promise to make cooperation known to law enforcement authorities, as opposed to a direct promise of a reduced sentence, generally is not considered an illegal inducement. In United States v. Nash, 910 F.2d 749, 752-53 (11th Cir. 1990), the United States Court of Appeals for the Eleventh Circuit held:
 "`We find that the district court was not clearly erroneous in accepting [the officer's] testimony that he only promised to make [the defendant's] cooperation known to the United States Attorney's office and gave no guarantee of a reduced sentence. Although [the officer] told [the defendant] that cooperating defendants generally "fared better time-wise," this statement did not amount to an illegal inducement: "telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.'"
 "(Quoting United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978)). Accord United States v. Levy, 955 F.2d 1098, 1105 (7th Cir. 1992) (holding that federal agent's indication to defendant that his cooperation would be reported to the United States Attorney did not make defendant's confession involuntary); United States v. Meirovitz, 918 F.2d 1376, 1380 (8th Cir. 1990) (holding that confession was voluntary although agents had promised to inform prosecutor of defendant's cooperation); United States v. Guerro, 847 F.2d 1363 (9th Cir. 1988) (holding that agent's promise to inform prosecutor of defendant's cooperation does not render a subsequent confession involuntary); United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir. 1985) (holding that an officer's promise to bring defendant's cooperation to the attention of the prosecutor did not make confession involuntary)."
Id. at 730 n. 4. Finally,
 "`[a]bsent clear error, the [circuit] court's credibility choices at suppression hearings are binding on this court." Walker v. State, 551 So.2d 449, 451 (Ala.Cr.App. 1989). The standard of review of conflicting evidence *Page 769 
at a motion to suppress a confession is whether the trial court's finding was "manifestly contrary to the great weight of the evidence." Ex parte Mathews, 601 So.2d 52 (Ala. 1992), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed. 2d 872 (1992). See also Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985) (whether the finding was "palpably contrary to the weight of the evidence.'").
"Thompson v. State, 611 So.2d 476, 478 (Ala.Cr.App. 1992)."
D. M. M. v. State, 647 So.2d 57, 61 (Ala.Cr.App. 1994).
Based on the conflicting evidence in the record before us, we conclude that the trial court did not err in admitting the appellant's statements into evidence. Accordingly, the appellant's argument is without merit.
 IV.
The appellant's fourth argument is that the State did not satisfy its burden of proving the admissibility of DNA evidence, as required by Ex parte Perry, 586 So.2d 242 (Ala. 1991). (Issue IV in the appellant's brief to this court.) Specifically, he contends that the testing procedures are not controlled and that the population frequency statistics are not realistic. Therefore, he argues that the trial court erred in admitting testimony about DNA testing into evidence at trial.
Initially, we note that
 "[a]t the time of the appellant's trial, § 36-18-30, Ala. Code 1975, not Perry, governed the admissibility of DNA evidence. That section provides:
 "`Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et ux., et al., v. Merrell Dow Pharmaceuticals, Inc., decided on June 28, 1993."
 "For DNA evidence to be admissible under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-95, 113 S.Ct. 2786, 2795-97, 125 L.Ed.2d 469
(1993), it must be reliable and relevant. Some factors that are germane in determining whether evidence is reliable include testimony 1) that the technique has been tested, 2) that the technique has been subjected to peer review and publication, 3) about the known or potential rate of error and quality controls associated with the technique, and 4) that the technique is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-97. In assessing reliability, the trial court should focus on the principles and methodology underlying the technique, not the conclusions they generate. Daubert, 509 U.S. at 594-95, 113 S.Ct. at 2797. In determining whether DNA evidence is relevant, the trial court should decide whether the evidence will help the factfinders understand the evidence or decide a fact that is in issue. Daubert, 509 U.S. at 591, 113 S.Ct. at 2795. Thus, to be admissible, the DNA evidence must relate to some issue in the case."
Maples v. State, 758 So.2d 1, 47 (Ala.Cr.App. 1999). Therefore, we will assess the admissibility of the DNA evidence under the Daubert standard.
In this case, Larry Huys, a forensic scientist employed by the Alabama Department of Forensic Sciences in its Birmingham laboratory, testified for the State as an expert in the field of DNA analysis. *Page 770 
He testified about both polymerase chain reaction (PCR) matching and population frequency statistics.
Regarding the PCR method, Huys testified that his laboratory uses a three-step process to perform DNA testing. First, scientists extract the DNA from the sample and purify, or clean, it. Second, they amplify, or make copies of, ten portions of the DNA molecule that have variation. Third, they perform a visualization, using dots or blots, to read or interpret the DNA molecule. Huys also testified that, before it started using the PCR method, the department performed a series of validation steps. In fact, he testified that the scientists probably worked with the method for one year before they started using it on actual cases.
Huys testified that other forensics laboratories throughout the United States use the PCR testing method, and added that the scientists "are constantly exchanging ideas, having meetings, going to various seminars to be sure everyone in the forensic community is on the same wavelength." (R. 367.) He stated that this type of testing is also widely used in areas other than forensics.
Regarding peer review and publication, Huys testified that the National Research Council (NRC) has performed two studies about the PCR method and that its conclusions have been very complimentary. He also testified that the Technical Working Group on DNA analysis sets forth guidelines for each laboratory to follow so it will be in compliance with other forensics laboratories throughout the world. He added that one of the department's scientists is a member of the board of the Technical Working Group on DNA analysis and that the department complies with that group's guidelines. He further testified that the department has published its data in various publications and that several agencies and scientists have scrutinized the department's testing process. Finally, he testified that the department's laboratory is accredited by the National Forensic Science Training and Research Center.
Regarding the known rate of error, Huys testified that he was not aware of any errors that had occurred in any of the DNA testing performed in the department's laboratory. He further stated that the department undergoes proficiency testing every 180 days, and added that, on nationwide proficiency tests, the results the department has obtained have been in 100 percent agreement with those obtained by other laboratories. He also testified that the department uses several quality controls to assure that the tests are performed properly, including testing blanks and known samples to detect contamination. Additionally, scientists duplicate the procedures on unknown samples to assure that they obtain the same results every time. They also process known and unknown samples on different days to avoid cross-contamination, and they use additional clean-up techniques to test for contamination. He testified that, to safeguard a sample, the sample is submitted in a sealed condition, maintained in a dry environment, and placed in a locked storage area. Finally, he testified that, in this case, the controls did not indicate that any errors had occurred during the testing process.
Finally, Huys testified that the PCR testing procedures used by the Alabama Department of Forensic Sciences are widely accepted in the scientific community as being reliable. Also, he noted that the department complies with the guidelines the DNA Advisory Board sets forth for the entire forensics community to follow.
Regarding population frequency statistics, Huys testified that, once a scientist has a match, he looks at a series of ten genetic traits or characteristics. Using *Page 771 
between 100 and 150 samples from the Alabama population, he determines in what proportions those traits occur. He then multiplies those proportions to determine how rare the combination of traits is in the general population. When doing such an analysis, the scientist also factors in a number that accounts for situations in which close relatives may reproduce.
Huys testified that the department compiled a database from the population within the state of Alabama, including samples from approximately 100 Caucasians and 100 black people. He explained that scientists have compared the Alabama database to other databases around the country and determined that the Alabama population is very consistent with those other populations. Regarding controls, Huys testified that the analyst who is in charge of the case would not produce the statistics independently. Rather, two analysts would calculate the statistics independently and compare their results. He stated that the resulting statistics could be published only if the two analysts independently obtained the same result. In this case, these controls did not indicate that any error occurred in calculating the population frequency statistics. Finally, Huys testified that the statistical methods the department uses to estimate the significance of a match have been used for years, are used by other laboratories that comply with NRC requirements, and are generally accepted in the scientific community.
At the conclusion of the hearing on the admissibility of the DNA evidence, the trial court stated:
 "The court finds that the PCR testing process is reliable and generally accepted by the scientific community and the results of those tests are relevant to this case. As to the population frequency statistics, the court finds overwhelmingly throughout the country these statistics are accepted. The court takes judicial knowledge of caselaw from states all over the country — Massachusetts, Arizona, and Mississippi — that allow these results in. The question that needs to be focused on is whether these statistics are generally accepted in the scientific community. The court finds that whereas in the early '90's, there was some general debate as indicated by the report that the attorney for the defendant referred to, based on the caselaw around the country as of today's date, there is no debate as to the use of these statistics. For this court to reject the use of those population statistics would be in itself a decision that would probably be a vast minority of the cases. The court finds these statistics are based on valid scientific principles. The court further finds that these statistics are generally accepted principles in the community. The court finds that, based on both literature and caselaw, these are accepted by experts in the field and that the interpretation of these statistics and what they mean and the weight and credibility to be given to them are certainly jury questions. The court finds that the DNA evidence in this case and the population frequency statistics are relevant to the issues in this case based upon the location of the stains involved and the proximity to the crime scene in this case. Based upon that, the court will allow this expert to testify as to the DNA test results under the PCR system as used and the court will further allow this expert to testify as to the population frequency statistics."
(R. 423-25.)
Based on the evidence presented, we conclude that the trial court did not err in admitting into evidence testimony regarding the PCR testing method and population frequency statistics. In this case, the State presented sufficient evidence to establish the reliability of the theory and *Page 772 
techniques used in the PCR testing method and in the population frequency statistical analysis. Furthermore, in Simmons v. State, [Ms. CR-97-0768, September 17, 1999] ___ So.2d ___ (Ala.Cr.App. 1999), this court took judicial notice of the reliability of the theory and techniques used in the PCR method of DNA analysis. Additionally, the DNA evidence was relevant to establishing the appellant's identity as the perpetrator of the murder, to corroborating the appellant's statements to police, and to supporting the State's theory that the appellant raped or attempted to rape the victim. Therefore, the trial court did not err in admitting into evidence testimony about the results of DNA testing.
 V.
The appellant's fifth argument is that the trial court improperly limited the scope of his cross-examination of Larry Huys. (Issue V in the appellant's brief to this court.) During defense counsel's cross-examination of Huys, the following occurred:
 "[Defense counsel]: Are you familiar with the case of [Cauthen v.] Yates, [716 So.2d 1256
(Ala.Civ.App. 1998)] that came out last year concerning DNA testing?
"[Huys]: No.
 "[Defense counsel]: You are not familiar with a lab in Birmingham having a probability of paternity in a case, and getting independent tests run and it —
 "[Prosecutor]: Judge, I object to this line of questioning. He is testifying before the jury the results of some case holding such and such. If he wants to offer a copy of that —
 "The Court: I'll sustain as to the form of that question.
 "[Defense counsel]: Are you familiar with people getting up and testifying concerning DNA evidence when it can change next week or next month or next year — new testing could be developed?
"[Huys]: Certainly.
 "[Defense counsel]: And these probabilities aren't accurate, are they?
 "[Huys]: They either go up or they go to zero. Every test you add, you would either get a much rarer statistic or it becomes an exclusion."
(R. 454-55.) Because the appellant did not present the objection he raises on appeal to the trial court, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
 "`The scope of cross-examination in a criminal proceeding is within the discretion of the trial judge and it is not reviewable except for the trial judge's prejudicial abuse of discretion. . . .
 "`While rather wide latitude is allowed on cross-examination, the court has reasonable discretion in confining the examination to prevent diversion to outside issues.'"
Steeley v. State, 622 So.2d 421, 423-24 (Ala.Cr.App. 1992), cert. quashed, 622 So.2d 426 (Ala. 1993) (quoting Beavers v. State, 565 So.2d 688, 690 (Ala.Cr.App. 1990)) (other citations omitted). Based on the record before us, we conclude that the trial court did not abuse its discretion in sustaining the State's objection to defense counsel's question. Huys stated that he was not familiar with the case to which defense counsel was referring. Thus, rather than limiting defense counsel's right to cross-examine Huys, the trial court simply prevented defense counsel from testifying as to, and questioning Huys about, the facts of a case with which Huys was not familiar. Furthermore, although the trial court sustained the prosecutor's objection as to the form of defense counsel's question, it did not prevent defense counsel from pursuing that line of questioning. In fact, defense counsel subsequently elicited testimony *Page 773 
that DNA evidence may change over time and that the probabilities could change as the testing procedures become more advanced. Therefore, we do not find any plain error in this regard.
 VI.
The appellant also argues that the trial court erred in denying his motion for a judgment of acquittal because the evidence was allegedly insufficient to support his conviction for capital murder. (Issues VI, VII, IX, and X in the appellant's brief to this court.) Specifically, he contends that the State did not prove that he committed a rape or an attempted rape and did not prove that he had a particularized intent to kill the victim.
 "Intentional murder becomes capital murder when the killing occurs during a rape. Section 13A-5-40, Code of Alabama 1975. `During' is defined in the Code as meaning `in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof.' Section 13A-5-39(2), Code of Alabama 1975. An accused is not guilty of a capital offense where the intent to commit the accompanying felony, in this case rape, was formed only after the victim was killed. Connolly v. State, 500 So.2d 57, 62 (Ala.Crim.App. 1985), aff'd, 500 So.2d 68 (Ala. 1986). An accompanying felony committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction of capital murder; the question of the defendant's intent at the time of the commission of the crime is usually a jury question. See Smelley v. State, 564 So.2d 74, 86-87
(Ala.Crim.App. 1990), cert. denied, Ex parte Green, 564 So.2d 89 (Ala. 1990); Connolly, supra at 63."
Padgett v. State, 668 So.2d 78, 83 (Ala.Cr.App.), cert. denied,668 So.2d 88 (Ala. 1995). Nevertheless,
 "[e]ven if we were to concede that the death occurred before the rape, another doctrine stands in the way of the appellant. This court has held that if an accused had the intent to commit the underlying offense at the time he murdered and the offense is committed immediately after the murder, he is guilty of murder while committing the underlying offense, and the capital murder statute still applies. Hallford v. State, 548 So.2d 526, 534
(Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). It seems to be generally understood that it is impossible to say with certainty whether intercourse immediately preceded or immediately followed the murder of a female victim."
Thompson v. State, 615 So.2d 129, 133 (Ala.Cr.App. 1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993). It is not necessary to show an injury to prove that a rape or an attempted rape occurred. See Greathouse v. State, 650 So.2d 599
(Ala.Cr.App. 1994). Additionally, "`[i]ntent, . . . being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.'" French v. State, 687 So.2d 202, 204
(Ala.Cr.App. 1995), rev'd on other grounds, 687 So.2d 205 (Ala. 1996) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Cr.App. 1986)).
 "`The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App. 1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App. 1981), cert. denied, 410 So.2d 449 (Ala. 1982).' Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App. 1985). `Where one assaults another by the use of a deadly weapon, the law will infer from that fact that he designed to *Page 774 
accomplish the probable and natural results of his act, in the absence of proof to the contrary.' Snipes v. State, 364 So.2d 424, 426 (Ala.Cr.App. 1978)."
Oryang v. State, 642 So.2d 989, 994 (Ala.Cr.App. 1994). Further, "[i]ntent may be inferred from the use of a deadly weapon, the character of the assault, or other attendant circumstances." DeRamus v. State, 565 So.2d 1167, 1171
(Ala.Cr.App. 1990). Finally,
 "`[i]n determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App. 1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala. 1985).
"`. . . .
 "`The role of appellate courts is not to say what the facts are. Our role, . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969). . . . A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger [v. State], 473 So.2d [1137] at 1139 [ (Ala.Cr.App. 1985)].
 ". . . `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed. 2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177
(Ala.Cr.App. 1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985)."
White v. State, 546 So.2d 1014, 1017 (Ala.Cr.App. 1989).
During the investigation of this case, the appellant made the following statements about his participation in the offense:
 "The night started off with a drink and smoking marijuana. I had a lot to drink and smoke this night. I was on the hill at about this time when I decided to leave and go home. It was about 10:30 pm or so. On my way home I stopped off at Russell's trailor and sat in there for a while and time passed by it was about 12:30 or 1 a.m when I left and headed home. When I crossed the ditch going into the apartments I decide to go see Melody but instead I went in *Page 775 
through the back window. (This occurs at about 1 or 1:30 a.m.) Once inside I grab an ordinary kitchen knife and headed upstairs. All I wanted was sex that was all I could think about at the time. About 1/3 the way up the stairs I pulled off my pants. When I went into the bedroom and stuck the knife at her neck and started undoing her shorts and by this time she jumps up and the knife I had in my hand cut her and so I panicked and she let out a little scream before she started to get loud I cover he mouth with my hand but she bit me. So we tussle around and I finally got her to keep still by putting my hand at her neck and proceeded to remove her shorts after I got the shorts off I realized that she had stop breathing so not being in my right state of mind I had sex and ejaculated outside of the vagina. I never meant to kill those were not my intentions. I have a problem and I want help. After I did what I did I left out of the back door and let the window down. I removed her purse from the apartment there was nothing in it worth anything to me so I throw the knife and purse in the dumpster out front of the apartments this was about 2:30-3:00am. So after I went home and slept on it. I never did anything like this before, I have let drugs, alcohol, and sex ruin my life."
(C.R. 124.)
 "The couch was at the back window. Took screen off back window laid it on couch. Climb through window onto a kitchen table. Saw and grabbed a knife off the counter. Proceed to go upstairs. First set of stairs. I removed my pants and shoes and went upstairs crossed over a kiddie rail or fence at top of the stairs. Just peeked in at the two kids. Went in to Melody's room stuck the knife at her neck. Proceeded remove her shorts. She awoke and jumped. The knife cut her neck I panicked we tussle off the bed onto the floor then there was no movement from her and no breathing so I had sex with her for about 15 or so minutes no condom I pulled out, shot off. When I panicked and she started to scream I grab her around her throat and proceeded to choke her that is when she stopped moving So I leave as I was leaving I grab her purse and go through it. Found nothing valuable. I leave out the back door putting my clothes back on. I let the window back down shut the door. I had the knife and purse in my hand threw both objects into dumpster in the apartments. The purse was green and black it was a flip top button in front with straps that you could wear like a back pack."
(C.R. 126.) In addition, the evidence showed that the appellant left the lower half of the victim's body unclothed and left a semen stain on her stomach area. DNA testing confirmed that blood and semen found at the scene were consistent with the appellant's genetic profile. Other evidence found at the crime scene also corroborated the appellant's statements about the offense. Finally, the medical examiner testified that the cause of the victim's death was asphyxiation, either by smothering or strangulation, and that the other wounds inflicted upon the victim were consistent with a beating but were not the cause of death.
The appellant's statements showed that he entered the victim's apartment with an intent to rape the victim and that he took a knife upstairs with him to facilitate the rape. Thus, the State presented sufficient evidence from which the jury could have reasonably concluded that the appellant raped or attempted to rape the victim and that he intentionally killed her. Accordingly, the trial court properly denied the appellant's motions for a judgment of acquittal and properly submitted the case to *Page 776 
the jury. Finally, the evidence clearly supports the jury's verdict. Therefore, the appellant's arguments in this regard are without merit.
 VII.
The appellant contends that the prosecutor made an improper comment during his guilt-phase closing arguments. (Issue XIII in the appellant's brief to this court.) During the State's rebuttal arguments, the following occurred:
 "On behalf of the State and the family, we don't want any sympathy in this case. It is over and done with. It is too late for sympathy. Sympathy has no place in this case. We don't want any. We do want justice. These are the kinds of things you can see on TV that happens somewhere else — not in Ashville, Alabama. This is a horrendous case and it deserves a capital murder verdict."
(R. 513) (emphasis added). The appellant argues that the prosecutor's comment encouraged the jury to find as an aggravating circumstance that the crime was especially heinous, atrocious, or cruel compared to other capital offenses. See § 13A-5-49(8), Ala. Code 1975. Because he did not object to the prosecutor's comment at trial, we review this argument for plain error.[2] See Rule 45A, Ala.R.App.P.
In reviewing a prosecutor's closing argument, the standard is whether the argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471,91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637,94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
 "In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App. 1987); Wysinger v. State, 448 So.2d 435, 438
(Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App. 1980), cert. denied, 404 So.2d 100
(Ala. 1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App. 1982)."
Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Cr.App. 1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala. 1991), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993).
 "`During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, . . . each case must be judged on its own merits,' *Page 777 
Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala. App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360
(Ala.Cr.App. 1990), aff'd, 590 So.2d 369 (Ala. 1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App. 1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139
(Ala.Cr.App. 1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App. 1992), aff'd,628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012,114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).
 "There is no impropriety in a prosecutor's appeal to the jury for justice and to properly perform its duty. "`We view the comments as a call for justice, not sympathy, and, thus, conclude that they are within the wide latitude allowed prosecutor's in their exhortation to the jury to discharge its duty." Ex parte Waldrop, 459 So.2d 959 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985); Rutledge v. State.' Gentry v. State, 689 So.2d 894, 906
(Ala.Cr.App. 1994), reversed on other grounds, 689 So.2d 916 (Ala. 1996)."
Price v. State, 725 So.2d 1003, 1033 (Ala.Cr.App. 1997), aff'd,725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133,119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Finally, we presume that the jury followed the trial court's instructions. See Taylor v. State,666 So.2d 36 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856
(1996). After reviewing the prosecutor's comment in context, we conclude that the comment was no more than a permissible appeal for justice. See Price, supra. Furthermore, during the penalty phase of the trial, the State informed the jury that the only aggravating circumstance it would rely on would be that the appellant committed the murder during the commission of a rape or an attempted rape. (R. 546-47, 569.) Additionally, the trial court instructed the jury as follows:
 "The aggravating circumstance that is relied upon by the State in this case is the following: That the capital offense was committed while the defendant was engaged in commission of or attempt to commit rape, robbery, burglary, or kidnapping. You may not consider in your deliberation any other aggravating circumstance other than the one that I have just read to you."
(R. 584.) We presume the jury followed the trial court's instructions. See Taylor, supra. Therefore, we do not find any plain error in this regard.
 VIII.
The appellant also argues that the trial court made several errors during its guilt-phase jury instructions.
 "A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App. 1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonable — not a strained — construction. King v. State, 595 So.2d 539
(Ala.Cr.App. 1991); Kennedy v. State, 472 So.2d 1092
(Ala.Cr.App. 1984)." *Page 778 
Williams v. State, 710 So.2d 1276, 1305 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929,118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
 "`A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App. 1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala. 1986).'
"Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App. 1992)."
Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Cr.App. 1995) (emphasis omitted). See also Dill v. State, 600 So.2d 343, 353-54
(Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).
 A.
First, the appellant contends that the trial court erred because it did not instruct the jury that it could find him not guilty by reason of mental disease or defect. (Issue XVI in the appellant's brief to this court.) However, he did not request such an instruction and did not object when the trial court did not give such an instruction. Accordingly, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
Before trial, the appellant entered a special plea of "not guilty by reason of mental disease or defect." (C.R. 54.) However, he admits in his brief on appeal that the defense did not request such an instruction and, in fact, had "abandoned this strategy before the trial started." (Appellant's brief at p. 70.) Additionally, he concedes that "the current status of the law would not agree with this argument." (Appellant's brief at p. 70.) Nevertheless, he argues that the trial court should have seen that "the situation . . . clearly featured a crazy man that had done a crazy and insane act," and should therefore have instructed the jury on his plea that he was not guilty by reason of mental disease or defect. (Appellant's brief at p. 70.) After thoroughly reviewing the record, we conclude that there was no evidence on the record that would support giving an instruction on the special plea. See Williams, supra; Hemphill, supra. Accordingly, we do not find any plain error in this regard.
 B.
Second, the appellant contends that the trial court erred by not instructing the jury on manslaughter as a lesser included offense. (Issues XIV and XXI in the appellant's brief to this court.) Although the prosecutor, defense counsel, and the trial court discussed whether the trial court should give such a charge, defense counsel did not object when the trial court stated that it would not instruct the jury on manslaughter. Likewise, counsel did not object after the trial court had given its oral charge. Therefore, we review this contention for plain error. See Rule 45A, Ala.R.App.P.
 "No error occurs in not giving a charge on a lesser included offense when there is no reasonable theory to support the lesser offense. . . . "`A trial judge may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense.'"
Williams v. State, 601 So.2d 1062, 1075 (Ala.Cr.App. 1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, *Page 779 113 S.Ct. 417, 121 L.Ed.2d 340 (1992) (citing Dill v. State, 600 So.2d 343,360 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), and Gurganus v. State, 520 So.2d 170, 174 (Ala.Cr.App. 1987)). When it refused to give the instruction on manslaughter, the trial court acknowledged that there was no basis for giving such an instruction because the appellant's statements showed that he entered the victim's apartment with the intent to rape her. Furthermore, during his guilt-phase closing argument, defense counsel admitted that, when the appellant entered the victim's apartment, he intended to rape her. (R. 498.) However, he contended that the appellant did not intend to kill the victim. Accordingly, he argued that the appellant was guilty, at most, of murder. During its guilt-phase oral charge, the trial court instructed the jury on the lesser included offense of felony murder. Thus, if the jury believed defense counsel's contention that the appellant intended to rape but did not intend to kill the victim, it could have found him guilty of felony murder. However, there was simply no reasonable theory from the evidence to support giving an instruction on manslaughter. Moreover, we have held that it is not plain error for a trial court not to give an instruction on a lesser included offense when that instruction would be inconsistent with the defense's trial strategy. See Bush v. State, 695 So.2d 70, 113 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138
(Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418,139 L.Ed.2d 320 (1997). Therefore, we do not find any plain error in this regard.
 C.
Third, the appellant contends that the trial court improperly instructed the jury on voluntary intoxication. (Issues XIV and XX in the appellant's brief to this court.) Specifically, he argues that the trial court's statement that, for intoxication to negate the specific intent that is necessary to sustain a capital murder conviction, it must be "so great as to amount to insanity," was confusing and misleading. (R. 530.) Because the appellant did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala.R.App.P.
We rejected a similar claim in Williams v. State, 710 So.2d 1276,1332 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699
(1998), stating as follows:
 "`Bankhead contends that the court's instruction requiring that the jury, in order to find a drunkenness defense applicable, had to find Bankhead insane due to intoxication, was prejudicial. We disagree. In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App. 1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr.App. 1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App. 1986)]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a *Page 780 
defendant's intoxication rendered it impossible for the defendant to form a particular mental state.'
"Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991)."
Furthermore, the appellant concedes that his argument is contrary to current law. Therefore, we do not find any plain error in the trial court's voluntary intoxication instruction.
 IX.
The appellant argues that, during the penalty phase of the trial, the trial court and the prosecutor made misleading references to the only applicable aggravating circumstance. (Issues XV and XVII in the appellant's brief to this court.) The aggravating circumstance the State relied on was that the appellant committed the murder during a rape or an attempted rape. See § 13A-5-49(4), Ala. Code 1975.
 A.
First, the appellant argues that the trial court erroneously instructed the jury on the aggravating circumstance. During the penalty phase of the trial, the trial court instructed the jury as follows:
 "The law provides a list of circumstances that may be considered by the jury as aggravating. In this case, the State relies on one aggravating circumstance. Before a jury could find an aggravating circumstance exists, you, the jury, must find beyond a reasonable doubt that aggravating circumstance does exist. The aggravating circumstance that is relied upon by the State in this case is the following: That the capital offense was committed while the defendant was engaged in the commission of or attempt to commit rape, robbery, burglary, or kidnapping. You may not consider in your deliberations any other aggravating circumstance other than the one that I have just read to you. The fact you have heretofore found the defendant guilty beyond a reasonable doubt of the capital offense of intentional murder during rape in the first degree establishes for the purpose of this hearing the existence beyond a reasonable doubt of the aggravating circumstance relied upon by the State. Because the circumstance that the State relies on for aggravation, is the capital offense was committed while the defendant was engaged in the commission of or attempt to commit rape. By your verdict yesterday, you have found beyond a reasonable doubt that that aggravating circumstance does exist. So the State has proven beyond a reasonable doubt the existence of one aggravating circumstance, and that is the circumstance [it relies] on."
(R. 584-85) (emphasis added). The appellant contends that, under the trial court's instruction, the jury could also have found as aggravating circumstances that he committed the murder during the course of a burglary, a robbery, and a kidnapping. However, he did not raise this issue at trial. Therefore, we review it for plain error. See Rule 45A, Ala.R.App.P.
A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123
(Ala.Cr.App. 1992). When reviewing a trial court's instructions, "`the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'" Self v. State,620 So.2d 110, 113 (Ala.Cr.App. 1992) (quoting Porter v. State,520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State,612 So.2d 1335 (Ala.Cr.App. 1992); Alexander v. State, 601 So.2d 1130
(Ala.Cr.App. 1992). After reviewing the trial court's instruction in its entirety, we conclude that the trial court instructed the jury that the only aggravating circumstance it could find in this case was that the appellant committed *Page 781 
the murder during a rape or an attempted rape. Furthermore, the trial court instructed the jury that, by virtue of returning a capital murder verdict, it had already found that the State had proven that aggravating circumstance beyond a reasonable doubt. Finally, when instructing the jury on weighing the aggravating and mitigating circumstances, the trial court reiterated that only one aggravating circumstance existed. (R. 591.) Therefore, the trial court's penalty-phase instructions did not allow the jury to find the existence of additional aggravating circumstances. Thus, we do not find any plain error in this regard.
 B.
The appellant also contends that the prosecutor engaged in improper argument about the applicable aggravating circumstance. During his penalty-phase opening arguments, the prosecutor stated:
 "That aggravating circumstance that the State is relying on . . . is that this crime — this capital offense which you have already found, was committed during the time that the defendant, Marcus Williams, was engaged in a rape, burglary, or robbery. That is set out in the Code. It sounds a lot like the charge and basically, that is why we submit the evidence at the trial as evidence in the sentencing hearing. If you find that Marcus Williams committed this capital offense — the rape and murder of Melanie Rowell while he was engaged in a rape, burglary or robbery or attempt thereof, then the State of Alabama has proved to you an aggravating circumstance. That is the aggravating circumstance on which we will rely."
(R. 546-47.) The appellant contends that "[i]t was wrong and misleading to argue to the jury that an aggravating circumstance could be one with which there had been no proof and for which Marcus Williams had not been charged." (Appellant's brief at p. 71.) Because he did not object to the prosecutor's comment at trial, we review this argument under the plain error rule. See Rule 45A, Ala.R.App.P.
As we stated earlier, we evaluate the comments made by the prosecutor in the context of the entire proceeding. See Duren v. State, 590 So.2d 360 (Ala.Cr.App. 1990), aff'd, 590 So.2d 369
(Ala. 1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594,118 L.Ed.2d 310 (1992). Furthermore, "`[t]o justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State,472 So.2d 1130, 1139 (Ala.Cr.App. 1985) (citations omitted)." Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App. 1992), aff'd,628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012,114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).
When viewed in context of the entire sentencing hearing, the prosecutor's comment was not misleading. During the State's penalty-phase closing arguments, the prosecutor stated:
 "In this case, there is one of those [aggravating circumstances that] we are relying on. The judge will read it to you. It basically says that if you commit the crime of murder during the commission of rape or an attempt of a first-degree rape, then that in itself is aggravating. I would submit to you Judge Austin will tell you simply by virtue that you returned a guilty verdict in this case of capital murder, then that aggravating circumstance was found by this jury to exist, and he will charge you it does exist, and therefore you can consider it in returning a death penalty."
(R. 569-70.) Also, as we discussed in Part A of this issue, the trial court properly instructed the jury that the only applicable aggravating circumstance was that the appellant committed the murder during a rape or an attempted rape. Accordingly, *Page 782 
we do not find any plain error in this regard.
 X.
The appellant argues that the victim's mother improperly gave overly emotional victim impact testimony during the sentencing hearing before the trial court. (Issue XVIII in the appellant's brief to this court.) Because he did not present this claim to the trial court, we review it for plain error. See Rule 45A, Ala.R.App.P.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597,115 L.Ed.2d 720 (1991), the United States Supreme Court held that victim impact evidence is admissible during the sentencing phase of a capital trial. "[A] prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial." McNair v. State, 653 So.2d 320, 331 (Ala.Cr.App. 1992), aff'd, 653 So.2d 353 (Ala. 1994), cert. denied, 513 U.S. 1159,115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). The State did not present victim impact evidence to the jury during the guilt or penalty phases of the trial. Furthermore, the record does not indicate that the victim's mother was overly emotional when presenting victim impact evidence to the trial court. Finally, the appellant concedes that his argument is contrary to current law. (Appellant's brief at p. 74.) Therefore, we do not find any plain error in this regard.
 XI.
The appellant further contends that "the manner of death used in Alabama is per se cruel and that the death penalty law, as it is applied, is unusual." (Issue XII in the appellant's brief to this court, at p. 65.) However, courts have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment. See Williams v. State, 627 So.2d 985 (Ala.Cr.App. 1991), aff'd, 627 So.2d 999 (Ala. 1993), cert. denied,511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Proffitt v. Florida,428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), rev'd on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Therefore, the appellant's argument is without merit.
 XII.
Finally, the appellant contends that his attorneys rendered ineffective assistance during his trial. (Issues XIX, XXII, XXIII, XXIV, XXV, and XXVI in the appellant's brief to this court.) Specifically, he contends that his attorneys:
 1) erred by abandoning his plea that he was not guilty by reason of mental disease or defect;
 2) erred by not presenting a mitigation expert during the penalty phase of the trial;
 3) erred by not presenting documentary evidence during the penalty phase of the trial;
 4) erred by not having its own DNA expert to testify at trial and to assist counsel in cross-examining the State's DNA expert;
 5) erred by not having an expert testify as to the effects of marijuana and alcohol; and
 6) erred by not having a forensic pathology expert testify that there was no evidence of a rape or an attempted rape.
However, the appellant did not first present these claims to the trial court in a motion for a new trial. Therefore, we review them for plain error. See Rule 45A, Ala.R.App.P. *Page 783 
 "[T]o prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 "`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
"Id. at 687, 104 S.Ct. at 2064.
 "`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App. 1994) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
 "When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531
(Ala.Cr.App. 1985).
 "`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
 "Strickland, 466 U.S. at 689, 104 S.Ct. at 2065
(citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987).
 "And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that `there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. *Page 784 
 "In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985)."
McNair v. State, 706 So.2d 828, 839 (Ala.Cr.App. 1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998).
After reviewing the appellant's claims, we conclude that he has not satisfied his burden of proving that his counsel's performance was deficient and that that deficient performance prejudiced him. Although he makes broad allegations, he has not supported them factually. For example, although he contends that counsel should have presented a mitigation expert and documentary evidence during the penalty phase of his trial, he has not alleged what additional evidence an expert could have presented or what documentary evidence existed that counsel did not present. In addition, he has not shown what additional evidence an expert could have presented about the effects of alcohol and marijuana, and has not shown that there is a reasonable probability that such evidence would have altered the outcome of his trial. Furthermore, the record refutes some of his claims. First, as stated in Part VIII of this opinion, there is no evidence that he was suffering from a mental disease or defect. Second, counsel thoroughly cross-examined the State's DNA expert, and there is no indication that an additional expert would have aided the defense in this area. Finally, the appellant alleges that an independent forensic expert was necessary to testify that the autopsy of the victim did not show that there had been a rape or an attempted rape. However, the coroner testified that, based on his examination of the victim's body, he could not determine whether anyone had raped or attempted to rape the victim. Thus, although he has made several allegations, the appellant has not shown that his attorneys performed in a deficient manner and that their allegedly deficient performance prejudiced him. Accordingly, we do not find any plain error in this regard.
 XIII.
Pursuant to § 13A-5-53, Ala. Code 1975, we must address the propriety of the appellant's conviction and sentence of death.[3] The appellant was indicted for, and convicted of, capital murder because he killed a person during the course of a rape. See § 13A-5-40(a)(3), Ala. Code 1975.
The record does not reflect that the sentence of death was imposed as a result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found that one aggravating circumstance existed: that the capital offense was committed while the appellant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary, or kidnapping. See § 13A-5-49(4), Ala. Code 1975. The trial court found that one statutory mitigating circumstances existed: the appellant had no significant history of prior criminal activity, § 13A-5-51(1), Ala. Code 1975. The trial court also found that the following were non-statutory mitigating circumstances: 1) the appellant's upbringing, 2) *Page 785 
the appellant's problem resulting from the end of a promising athletic career, 3) the appellant's attainment of his GED after failing to graduate from high school, and 4) the appellant's remorse. The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced the appellant to death. Its decision is supported by the record, and we agree with its findings.
Section 13A-5-53(b)(2), Ala. Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's death sentence. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant killed the victim during the course of a rape or an attempted rape. Similar crimes are being punished by death throughout this state. See Brooks v. State, 695 So.2d 176
(Ala.Cr.App. 1996), aff'd, 695 So.2d 184 (Ala.), cert. denied,522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997); Freeman v. State, 555 So.2d 196 (Ala.Cr.App. 1988), aff'd, 555 So.2d 215, (Ala. 1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604,110 L.Ed.2d 284 (1990); Bradley v. State, 494 So.2d 750 (Ala.Cr.App. 1985), aff'd, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923,107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). Thus, we find that the sentence of death was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala.R.App.P. The appellant's arguments to the contrary are without merit.
Accordingly, we affirm the appellant's conviction and sentence of death by electrocution.
AFFIRMED.
Long, P.J., and McMillan, Cobb, and Fry, JJ., concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[2] During the rebuttal portion of the State's penalty-phase instructions, the prosecutor referred to the crime as "horrible." (R. 579.) At the close of the trial court's instructions, the appellant asked for a curative instruction, alleging that the use of the word "horrible" implied that the especially heinous, atrocious, or cruel aggravating circumstance was present. However, the appellant subsequently withdrew the request and announced that he was satisfied with the trial court's instruction. (R. 595.)
[3] In Issues VIII and XI in his brief to this court, the appellant makes general allegations that his rights have been violated and that the death penalty is being imposed arbitrarily. Because he has not alleged his claims with sufficient specificity, we will incorporate our discussion of these issues into this portion of our opinion.