Angela Moore MacEwan was convicted of capital murder, specifically the murder of a child under the age of 14, in violation of § 13A-5-40(a)(15), Ala. Code 1975, in connection with the death of her two and one-half year old daughter, Sydney Isabel Moore. MacEwan was sentenced to life in the penitentiary without the possibility of parole. The evidence presented at trial was largely undisputed and presented the following relevant facts.
MacEwan gave birth to Sydney on April 7, 1992, after becoming estranged from the child's father. Immediately following her *Page 68 
birth, Sydney began to experience numerous medical problems, including violent seizures and intolerance to her formula. The infant's medical problems required constant attention. Sydney required numerous trips to the emergency room during the first year of her life.
Soon after Sydney's birth, MacEwan's boyfriend, Dallas Sita, moved into the apartment with them. Sita, a witness for the State, testified that he babysat Sydney for the first year of her life while MacEwan worked as a dancer at a local club. Testimony revealed that Sita was very attached to Sydney and treated her like she was his own daughter.
When Sydney was about one year old, MacEwan stopped working and stayed at home with the child on a full-time basis. Sita began working at different jobs to support them. During a two-month hospitalization for infectious pneumonia, Sydney was diagnosed as having an extremely rare genetic disorder, which was responsible for her medical problems. MacEwan was told that, in addition to the medical problems that had already manifested themselves, the disorder would severely hinder Sydney's mental and physical development. Sydney was never expected to be able to walk or to take care of herself. Additionally, Sydney's inability to retain food after eating necessitated the insertion of a feeding tube that allowed nourishment to be fed directly into her stomach. Sydney required a number of medications to control her seizures and other medical problems, all of which were administered through the stomach tube.
At some point before October 15, 1994, MacEwan and Sita started having a series of arguments over Sita's involvement with another woman. On October 15, 1994, MacEwan told Sita that if he left her he would never see Sydney again. Sita testified that the last time he saw Sydney alive was when he left the apartment that day.
MacEwan testified that she waited that evening for Sita to return. She testified that, when he did not return, she took some pills and fell asleep watching a movie. Sydney was lying beside her on a mattress. MacEwan testified that Sydney was dead when she awoke the next morning. MacEwan claimed to have no memory of any events from the time she went asleep until she found Sydney dead.
Upon learning of Sydney's death, Sita went to Cooper Green Hospital where Sydney's body had been taken. He then went to the University of Alabama at Birmingham hospital to see MacEwan, who had apparently attempted to commit suicide by slashing her wrists and legs with a razor blade. Sita testified that MacEwan told him that before she fell asleep she had given Sydney extra phenobarbital and Benadryl because she would not stop crying. Both drugs were part of Sydney's regular medications. Sita testified that when he asked MacEwan how much of the drugs she had given Sydney, she replied, "A lot." (R. 226.)
Sita testified that he went to MacEwan's apartment the next day to clean up. At the apartment Sita found an empty bottle of phenobarbital and an empty bottle of Benadryl. Sita testified that when he left the apartment the day before Sydney's death the bottle of phenobarbital, which held between five and seven ounces, was full. Additionally, the eight-ounce bottle of Benadryl was full except for approximately four teaspoons. Sita also testified that MacEwan had apparently cut herself intentionally with a razor blade on the day Sydney died and had again similarly attempted suicide two days after Sydney's death. Sita testified that MacEwan was hospitalized in the psychiatric ward for two or three weeks after the second suicide attempt.
Andrew Robinson, a forensic toxicologist for the Jefferson County medical examiner's office, testified that he performed tests on blood, urine, bile, and gastric samples taken from the victim. Robinson testified that he became suspicious of the circumstances of Sydney's death after test results revealed a blood alcohol level of .04 grams per 100 milliliters. For comparative purposes, Robinson explained that a blood alcohol level of .08 grams per 100 milliliters is the level at which an adult is considered legally intoxicated. Robinson explained that Benadryl is marketed in elixir form that contains alcohol as an ingredient. Further testing revealed *Page 69 
that a lethal concentration of Benadryl was present in Sydney's blood. Robinson estimated that it would have taken a minimum of 6.7 ounces of Benadryl elixir to achieve the levels of Benadryl and alcohol found in Sydney's system. Robinson also testified that although phenobarbital was found in Sydney's system in an amount higher than a therapeutic level, the level was not considered lethal.
Dr. Gregory Davis, associate coroner-medical examiner at the Jefferson County coroner-medical examiner's office, testified that he examined Sydney's body and determined her cause of death to be Benadryl intoxication. Dr. Davis testified that the ingestion of approximately eight ounces of Benadryl elixir would have caused the levels found in Sydney's system. MacEwan offered no explanation at trial as to how Sydney could have been administered a lethal dose of Benadryl.
MacEwan raises four issues on appeal.
 I.
MacEwan argues that the trial court erred in refusing to give her requested jury instruction concerning heat-of-passion manslaughter. Heat-of-passion manslaughter is defined at §13A-6-3(a)(2), Ala. Code 1975, as follows:
 "(2) [Causing] the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he [or she] causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself."
MacEwan contends that she provided sufficient evidence at trial to justify an instruction on heat-of-passion manslaughter. She contends that a jury could have determined that the stress generated from both raising a handicapped child and losing her live-in companion caused her to act "in the heat of passion." We find MacEwan's argument without merit.
Alabama law is settled as to when a defendant is entitled to a jury instruction on a lesser included offense. A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses. Kennedy v. State, 494 So.2d 792, 794
(Ala.Cr.App. 1986); Wiggins v. State, 491 So.2d 1046, 1047-48
(Ala.Cr.App. 1986); Chavers v. State, 361 So.2d 1106, 1107
(Ala. 1978). "The defendant has the right to request instructions based upon any material hypothesis which the evidence in his favor tends to establish." Ex parte Stork,475 So.2d 623, 625 (Ala. 1985). We hold that MacEwan failed to advance any reasonable theory from the evidence to support a jury charge on heat-of-passion manslaughter.
Alabama appellate courts have frequently addressed the level of recognized legal provocation required in order to prove heat-of-passion manslaughter. The instances in which sufficient provocation has been found fall in two categories. Where one party finds his or her spouse in the act of committing adultery, there is sufficient legal provocation to support an instruction on heat-of-passion manslaughter in the subsequent killing of the offending spouse or the paramour. Biggs v.State, 441 So.2d 989, 992 (Ala.Cr.App. 1983). Also, if a person who has been physically assaulted, suddenly and still under the maddening influence of the blow, slays the assailant, a jury can properly find that there was sufficient provocation for a conviction of manslaughter. Perry v. State, 453 So.2d 762, 765
(Ala.Cr.App. 1984). Mere words, whether they consist of threatened future adultery, admitted past adultery, or other language, no matter how abusive or insulting, will not reduce a homicide from murder to manslaughter. See Biggs, supra, 441 So.2d at 992; Perry, supra, 453 So.2d at 765.
The instant case does not fall under either category. MacEwan, in essence, asks us to find a reasonable theory from the evidence that she had sufficient provocation to kill her daughter either because of the stress caused by her belief that her boyfriend was leaving her and Sydney for another woman; because of the stress caused by raising a child with severe physical and mental disabilities; or because of some combination of both *Page 70 
of these factors. We fail to see the possibility of such provocation in any of these categories. Even an extreme emotional or mental disturbance, without legally recognized provocation, will not reduce murder to manslaughter. Gray v.State, 482 So.2d 1318, 1319 (Ala.Cr.App. 1985).
To rule that a severely handicapped child, under the age of three, could somehow provoke her mother to kill her would go beyond the boundaries of well established precedent, public policy, and principles of jurisprudence. The trial court properly rejected MacEwan's request for a jury instruction on heat-of-passion manslaughter.
 II.
MacEwan argues that the trial court improperly denied her request for a jury selection consultant. Specifically, MacEwan contends that a jury selection consultant was necessary for the selection of an unbiased jury because of the emotional nature of the case. We find this argument without merit.
The United States Supreme Court, in Ake v. Oklahoma,470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), held that an indigent defendant is entitled to the assistance of a competent psychiatrist when the defendant's sanity at the time of the offense is a significant factor at trial. In Caldwell v.Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231
(1985), the United States Supreme Court found no need to determine what kind of showing a defendant would have to make to be entitled to the assistance of an expert if the defendant offered nothing more than mere assertions that the requested experts would have been beneficial to his or her defense. The Alabama Supreme Court has interpreted Ake and Caldwell, taken together, to "hold that a defendant, to be entitled to funds to pay for an expert, must show more than a mere possibility of assistance from an expert." Dubose v. State, 662 So.2d 1189,1192 (Ala. 1995). "[A] fair reading of [Ake and Caldwell] is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." Dubose v. State,662 So.2d 1156, 1182 (Ala.Cr.App. 1993), aff'd, 662 So.2d 1189
(Ala. 1995), quoting Moore v. Kemp, 809 F.2d 702, 712 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192,95 L.Ed.2d 847 (1987). The appellate courts of this state have upheld the denial of a jury selection expert. See Duren v. State,507 So.2d 111, 119 (Ala.Cr.App. 1986), aff'd, 507 So.2d 121
(Ala. 1987), cert. denied, 484 U.S. 905, 108 S.Ct. 249,98 L.Ed.2d 206 (1987).
MacEwan merely asserts that a jury selection consultant was needed because of the emotional nature of the case. She has failed to demonstrate either that there was a reasonable probability that a jury selection expert would have been of assistance to her defense or that the denial of a consultant deprived her of a fair trial. The trial court did not err in denying MacEwan's request for a jury selection consultant.
 III.
MacEwan argues that the trial court erred in denying her motion for a judgment of acquittal because, she contends, the evidence presented by the State at trial was insufficient to support submitting the case to a jury for a determination on her capital murder charge under § 13A-5-40(a)(15), Ala. Code 1975, which required a showing that she intentionally murdered a child who was under 14 years of age. MacEwan correctly argues that the evidence presented at trial was largely circumstantial. Despite this, our review of the record reveals that the State did, in fact, present adequate evidence to submit the capital murder case to the jury.
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in a light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude."
Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.); cert. denied,368 So.2d 877 (Ala. 1979), citing United States v. Black,497 F.2d 1039 (5th Cir. 1974). Additionally, circumstantial *Page 71 
evidence may form the proof of the corpus delicti; if facts are presented from which a jury may draw a reasonable inference that a crime has been committed, the case must be submitted to the jury. Breeding v. State, 523 So.2d 496, 500
(Ala.Cr.App. 1987).
The State established that Sydney was two and a half years old and because of her age and illness was incapable of feeding herself or administering any of her own medication. Also no one but MacEwan was with Sydney during the time the fatal dose of Benadryl would have to have been administered. Dallas Sita testified for the State that MacEwan had told him he would never see Sydney again if he left the apartment. Sita's testimony also suggested that, when she talked to him after the child's death, MacEwan was cognizant of the fact that she had given Sydney "a lot" more than her usual dose of Benadryl. Sita also testified that he found an empty eight-ounce bottle of Benadryl in MacEwan's apartment and that it had been nearly full when he last saw Sydney alive. The forensic witnesses for the State established that Sydney's death was caused by an overdose of Benadryl.
If the jury believed the State's evidence, it could have reasonably concluded that MacEwan killed Sydney. The evidence presented by the State was adequate to support the trial court's determination that MacEwan's capital murder charge should be submitted to the jury and that her motion for a judgment of acquittal should be denied.
 IV.
MacEwan argues that the statute under which she was convicted, § 13A-5-40(a)(15), Ala. Code 1975, is unconstitutional because it, she says, "creates an arbitrary classification which is not rationally related to a legislative purpose." MacEwan cites no authority to support her argument. The statute in question classifies as a capital offense a murder when the victim is less than 14 years of age. We find the argument to be without merit.
This Court, in Ex parte Woodard, 631 So.2d 1065
(Ala.Cr.App. 1993), cert. denied, 662 So.2d 929 (Ala.), cert.denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994), has previously upheld the constitutionality of the statute in question against an identical challenge. In determining that §13A-5-40(a)(15) was rationally related to the legislature's goal of providing special protection for those people who are at an age at which public policy has concluded they may not be responsible for their own acts (below age 14), this Court wrote:
 " ' "Because the statute does not proscribe activities that are legally protected and does not involve any legally cognizable 'suspect' class, 'the classification [of child-murder] must be upheld if "any of the facts rationally justifying it is demonstrated to or perceived by the court." ' " ' "
Woodard, 631 So.2d at 1073, quoting Hardy v. State,576 So.2d 685, 686 (Ala.Cr.App. 1991) (citations omitted).
Based on the above, we again hold that § 13A-5-40(a)(15) is not unconstitutionally arbitrary.
For the above stated reasons, the judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.