[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1123 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1124 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1125 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1126 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1127 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1128 
The appellant, Danny Ray Living, was convicted of two counts of capital murder for killing two persons by one act or pursuant to one scheme or course of conduct.[1] See §13A-5-40(a)(10), Ala. Code 1975. Living was sentenced to life imprisonment without the possibility of parole and was ordered to pay restitution in the amount of $20,531.32.
The evidence at trial indicated the following facts. On July 1, 1996, Living and his wife Jennifer signed "divorce papers." In the weeks prior to this event, Jennifer had been residing with her son Chad Thornton and Chad's wife Melissa. On July 3, 1996, Jennifer, Chad, and Melissa went to the Livings's home to gather some of Jennifer's things and to retrieve some furniture. Jennifer planned to sell the furniture and had made arrangements with a potential buyer, David Cluxton, to pick up the furniture that afternoon.
Jennifer and Melissa arrived at the marital home at 7:05 p.m. and Chad arrived approximately 20 minutes later. When Chad arrived, his mother and his wife were waiting for Cluxton in the carport and Living was mowing the lawn. Approximately 10 to 15 minutes after Chad arrived, Cluxton arrived. Jennifer, Chad, Melissa, and Cluxton went inside to view the furniture. While Jennifer and Cluxton were negotiating over the price, Living came inside.
Not long after Living came inside, the telephone rang and Living answered it. Living then went into the living room where Jennifer and the others were showing Cluxton a sofa; he exclaimed to Jennifer: "Telephone; It's the City. I fucking appreciate it." The telephone call was the Athens Police Department calling to verify a police report that Jennifer had filed. Apparently, Living was the subject matter of the police report. Living's expression and attitude changed dramatically after he answered the telephone. After taking the telephone call, Jennifer resumed showing Cluxton the items that were for sale.
Shortly thereafter, Cluxton agreed to buy the sofa as well as a television and a refrigerator. While Chad was helping Cluxton load the television and the refrigerator on Cluxton's truck, Living, Jennifer, and Melissa were inside the house alone. As soon as Chad and Cluxton loaded the refrigerator on the truck, they heard several gunshots fired in rapid succession. As he heard the gunshots, Chad also heard his wife scream.
Upon hearing the gunshots, Chad and Cluxton immediately ran to a neighbor's house and telephoned the emergency number 911. Both men then saw Living come out of the house with a gun in his hand and go back inside. Once the police arrived on the scene, Living came out of the house, surrendered, and was taken into custody. *Page 1129 
Both Jennifer and Melissa died as a result of gunshot wounds.
 I.
Living contends that the trial court erred by failing to instruct the jury on heat-of-passion manslaughter. A person accused of the greater offense is entitled to have the trial court charge on lesser offenses included within that offense when there is a reasonable theory from the evidence supporting the lesser offenses. Hill v. State, 699 So.2d 974 (Ala.Crim.App. 1997). InMacEwan v. State, 701 So.2d 66 (Ala.Crim.App. 1997), the appellant requested a jury instruction on heat-of-passion manslaughter; the trial court refused to give the instruction. The appellant in MacEwan contended that the stress generated both from raising a handicapped child and from breaking up with her boyfriend caused her to act in the "heat of passion." In reaching the conclusion that the evidence did not warrant a heat-of-passion manslaughter instruction, this Court stated:
 "Alabama appellate courts have frequently addressed the level of recognized legal provocation required in order to prove heat-of-passion manslaughter. The instances in which sufficient provocation has been found fall in two categories. Where one party finds his or her spouse in the act of committing adultery, there is sufficient legal provocation to support an instruction on heat-of-passion manslaughter in the subsequent killing of the offending spouse or the paramour, Biggs v. State, 441 So.2d 989, 992 (Ala.Cr.App. 1983). Also, if a person who has been physically assaulted, suddenly and still under the maddening of the blow, slays the assailant, a jury can properly find that there was sufficient provocation for a conviction of manslaughter. Perry v. State, 453 So.2d 762, 765 (Ala.Cr.App. 1984). Mere words, whether they consist of threatened future adultery, admitted past adultery, or other language, no matter how abusive or insulting, will not reduce a homicide from murder to manslaughter. See Biggs, supra, 441 So.2d at 992; Perry, supra, 453 So.2d at 765."
701 So.2d at 69.
Living contends that he presented ample evidence at trial to support an instruction on heat-of-passion manslaughter. The evidence at trial showed that Living and his wife were going through a bitter divorce. On the day of the murders, Living had consumed a large amount of alcohol and Valium and had a heated argument with Jennifer after receiving a telephone call from the police department. According to Living's statements given to the psychologist who testified for the defense and to law enforcement officers, Jennifer was "raving mad" after the call and she shoved him at some point during the argument.
In the present case, Living failed to advance a reasonable theory from the evidence to support a jury instruction on heat-of-passion manslaughter. At trial, Investigator Bobby Smith of the Limestone County district attorney's office testified that he, Sheriff Mike Blakely, and Investigator Brad Pullom interviewed Living after the killings. According to Investigator Smith, Living repeatedly gave the following reason for the shootings: "[y]ou would just have to know them." Investigator Smith also stated that Living made the following comments:
 "A: He said that Jennifer was giving him pure hell and he was under a lot of stress. He had seen the doctor who had prescribed medication to try to correct the problem. Indicated that it's been eating at him for some time. He was asked about the gun, when did he get it, *Page 1130 
and I think his response was when it came to the event, the shooting.
 "Q: But he said he went and got the gun, is that what you are saying?
 "A: Yes, sir. I think at one point he said that there was an argument, and after they came back into the house I think he indicated at one time that Jennifer had shoved him and that the reason for shooting [Melissa] was that she came in and in a shrill voice said that he was going to do this and going to do that, and another reason was that Jennifer had told him that she was going to take him to the cleaners. He said she had literally broke him and that he was having a problem. He said that he just lost it and began firing."
(R. 1209-1210.)
Neither the foregoing statement nor the statement to the psychologist for the defense indicates that Living killed Jennifer or Melissa while "suddenly and still under the maddening of the blow" he received from Jennifer. (R. 1209, 1281.) In fact, the record does not reveal whether Living killed the victims immediately after he says he was shoved or whether the shootings occurred after an adequate amount of time to allow Living to cool off. (R. 1209, 1227, 1281.) Living's statements suggest that a combination of different factors, not simply being shoved or assaulted, led to the murder of the victims; i.e. the acrimonious divorce, stress, Jennifer's threat to financially break Living, and the heated argument that led to the shoving.
However, "an extreme emotional or mental disturbance, without legally recognized provocation, will not reduce murder to manslaughter." MacEwan v. State, 701 So.2d at 70. (quoting Grayv. State, 482 So.2d 1318, 1319 (Ala.Crim.App. 1985)). Moreover, Jennifer shoving Living during an argument does not constitute legal provocation for heat-of-passion manslaughter. "A minor technical assault which did not endanger life or inflict serious physical injury or inflict substantial and considerable pain would not amount to sufficient provocation." Shultz v. State,480 So.2d 73, 76 (Ala.Crim.App. 1985). Because no evidence of adequate legal provocation was presented at trial, the trial court did not err in refusing to instruct the jury on heat-of-passion manslaughter.
 II.
Living contends that the trial court's charge on inconsistent verdicts was erroneous and misleading. While instructing the jury, the trial court stated:
 "It would be inconsistent to find the defendant guilty of capital murder or murder of one of the victims and guilty of manslaughter of the other victim. Capital murder and murder require specific intent. Manslaughter does not require specific intent."
Living argues that although it would have been inconsistent to return a verdict of capital murder with regard to one victim and a verdict of a lesser offense as to the other, it would not have been inconsistent to return a murder verdict as to one and a manslaughter verdict as to the other. Specifically, he argues that the jury could have returned a murder verdict with respect to Jennifer and a manslaughter verdict with respect to Melissa. We find this argument to be without merit.
"A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case." Ingram v. State, 779 So.2d 1225
(Ala.Crim.App. 1999) (citing Raper v. State, 584 So.2d 544
(Ala.Crim.App. 1991)). Moreover, this Court does not review jury instructions in isolation, instead we consider the instruction *Page 1131 
as a whole. Stewart v. State, 601 So.2d 491 (Ala.Crim.App. 1992).
At trial, Living's defense was premised on two theories: (1) that there was no evidence that he killed the two victims pursuant to one scheme or course of conduct and that, therefore, he could not be found guilty of violating § 13A-5-40(a)(10); and (2) that he was so intoxicated from alcohol and prescription drugs at the time of the killings that he could not form the specific intent to kill Jennifer and Melissa. (R. 671). On appeal, however, Living argues that the jury could have found that he intentionally killed Jennifer, but that he did not intend to kill Melissa. Therefore, according to Living, the jury could have found him guilty of murder with regard to Jennifer and guilty of reckless manslaughter with regard to Melissa.
Under the doctrine of transferred intent, however, if Living intended to kill Jennifer he would be criminally culpable for murder with regard to the unintended death of Melissa. See Harveyv. State, 111 Md. App. 401, 681 A.2d 628 (1996) (the doctrine of transferred intent operates with full force whenever the unintended victim is hit and killed; it makes no difference whether the intended victim is missed; hit and killed; or hit and only wounded.) Several jurisdictions have held that the doctrine of transferred intent is applicable when a defendant kills an intended victim as well as an unintended victim. See, e.g., Statev. Fennell, 340 S.C. 266, 531 S.E.2d 512 (2000); Ochoa v. State, Nev., 981 P.2d 1201, 1205 (1999); Mordica v. State,618 So.2d 301, 303 (Fla.Dist.Ct.App. 1993); and State v. Worlock,117 N.J. 596, 569 A.2d 1314, 1325 (1990).
By giving the jury a "inconsistent verdict" instruction, the trial court merely stated that based on Living's theory of the case he either intended to kill both victims or he did not. We agree. If Living had intended to kill Jennifer, his specific intent would transfer to the killing of Melissa. Thus, under the facts of this case the jury could not have found that Living committed murder with regard to Jennifer and reckless manslaughter with regard to Melissa. We find, therefore, that the trial court's instruction was not reversible error.
 III.
Living contends that the trial court erred by giving what he says were misleading and confusing jury instructions pertaining to voluntary intoxication and manslaughter. Specifically, Living argues that the trial court's "charge led the jury to believe that voluntary intoxication applied only to the charge of manslaughter, and did not apply to negate the charges of capital murder and murder." Appellant's Brief, at p. 11. The part of the trial court's instruction that Living complains of reads as follows:
 "I would now like to go to an explanation of the lesser included offense of manslaughter. A killing that is not intentional, but results from recklessness, which I will define, is manslaughter rather than murder. The question of voluntary intoxication enters the picture at this juncture."
(R. 1425) (emphasis added). Living argues that the portion of the instruction emphasized above was misleading and erroneous because, he argued, it led the jury to believe that intoxication would not be relevant unless and until manslaughter was considered as a lesser included offense. In addition, Living argues that the foregoing instruction implied that manslaughter could be considered as a lesser included offense by the jury only if it found that he was intoxicated. We find these arguments to be without merit. *Page 1132 
As we mentioned previously, this Court does not review a jury instruction in isolation, instead we consider the instruction as a whole. Stewart v. State, 601 So.2d 491 (Ala.Crim.App. 1992). A careful review of the record indicates that the trial court adequately charged the jury on both intoxication and manslaughter. With regard to voluntary intoxication, the trial court elaborated on how the jury should consider intoxication, stating:
 "I charge you, members of the jury, that where, as in this case, the defendant is charged with a crime requiring specific intent and there is evidence of the defendant's intoxication — that is drunkenness — as affecting the mental state and condition of the accused, the defendant's possible intoxication is a proper subject to be considered by the jury in deciding the question of the defendant's intent. Intoxication of the Defendant, Danny Ray Living, may be considered by you whenever it is relevant to negate an element of an offense such as intent.
 "The crime of capital murder as charged in Counts I and II of the indictment is a crime that requires specific intent. The crime of intentional murder, a lesser included offense to capital murder, also requires specific intent. . . .
 "If you find from the evidence that Danny Ray Living was so intoxicated that he could not form specific intent, an essential element of both capital murder and intentional murder, you cannot find the Defendant, Danny Ray Living, guilty of either capital murder or intentional murder."
(R. 1426-27.) The trial court clearly and unambiguously instructed the jury that it could consider intoxication when it considered the offenses of capital murder and murder. With regard to the manslaughter instruction, the trial court stated:
 "I will now charge you as to manslaughter. A person commits the crime of manslaughter if he recklessly causes the death of another person. To convict, the State must prove beyond a reasonable doubt each of the following elements of manslaughter: (1) that Jennifer Living, as alleged in Count I, and Melissa Pitman Thornton, as alleged in Count II are dead; and (2) that the Defendant, Danny Ray Living, recklessly caused the death of Jennifer Living, Count I, and Melissa Pitman Thornton, Count II, by shooting them with a pistol.
 "A person who created a risk but is unaware thereof solely by reason of voluntary intoxication, acts recklessly with respect thereto. I have previously defined for you voluntary intoxication.
 "If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter, then you shall find the defendant guilty of manslaughter.
 "If you find the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of manslaughter, then you can not find the defendant guilty of manslaughter."
(R. 1428-29.) Nothing in the foregoing instruction suggests that manslaughter could be considered by the jury only if it found Living was intoxicated. The trial court's instruction simply informs the jury that voluntary intoxication is a relevant factor to consider in determining whether Living acted recklessly. Cardenv. State, 621 So.2d 342, 349 (Ala.Crim.App. 1992) (a defendant who was convicted of reckless manslaughter created a unjustifiable risk, by virtue of voluntary intoxication, when he drove his truck into oncoming traffic). Because the trial court's instructions on voluntary intoxication and manslaughter *Page 1133 
were neither misleading nor confusing, the trial court committed no reversible error.
 IV.
Living contends that the trial court erred in its instruction to the jury regarding the credibility of the witnesses. This argument is without merit. "If a requested charge that would be a proper instruction is covered in the oral charge or by the given requested charges, then its refusal does not constitute error." Exparte Wilhite, 485 So.2d 787 (Ala. 1986). At trial, the trial court gave the following instruction to the jury:
 "In this case you have heard testimony of several witnesses and an issue in all cases is the credibility of witnesses who testified. You'll have to first determine the truthfulness and honesty of the witnesses and then the weight to be given to their testimony. You should give the testimony of each witness such weight as in your judgment it is fairly entitled to receive. You're the sole judges of the credibility of the witnesses, and if there's any conflict in their testimony, your function is to resolve the conflict and determine the truth.
 In determining the credibility of a witness and the weight to be given his or her testimony, you may and should consider the following: The conduct and demeanor of the witness while testifying, their frankness or lack of frankness while testifying, the reasonableness or unreasonableness of their testimony, the witness's knowledge of the facts to which he or she was testifying, the accuracy of the witness's recollection, and the degree of intelligence shown by the witness. You should also take into consideration the character and appearance of the witness at trial and any bias she or he has shown in her or his testimony in determining the credit to be given to her or his testimony."
(R. 1431-32.) The trial court gave an adequate oral charge on the credibility of witnesses; and there was no error in this instruction.
 V.
Living alleges that the trial court erred when it failed to grant his challenges for cause with respect to eight jurors. This argument is without merit. "A trial court's decision concerning the disqualification of a juror is entitled to great weight on appeal and will not be disturbed unless clearly shown to be an abuse of discretion." Oryang v. State, 642 So.2d 979, 988
(Ala.Crim.App. 1993) (citing Ex parte Dinkins, 567 So.2d 1313,1314 (Ala.Crim.App. 1990)). The test to be applied to determine whether to disqualify a prospective juror for cause is whether the juror can set aside his or her opinion and try the case fairly and impartially according to the law and the evidence. Ex parteTaylor, 666 So.2d 73, 82 (Ala. 1995). In the present case, Living argues that based on answers given in the juror questionnaires, eight prospective jurors should have been removed for cause. We will address each claim individually.
Living challenged R.T. for cause. R.T. responded to a question on his jury questionnaire that he had formed the opinion that Living should receive "jail or death." (R. 601.) In addition, R.T. answered questions on the questionnaire in such a manner to suggest that he did not believe in the presumption of innocence and that he did not think life without the possibility of parole was a severe sentence. (R. 601.) Living also sought to have R.T. disqualified because he exclaimed on the questionnaire that "no matter what, he [Living] should go down."
In order to disqualify a veniremember based on a challenge for cause, *Page 1134 
there must be a proper statutory ground or some other matter that indicates absolute bias and leaves nothing to the discretion of the trial court. Clark v. State, 621 So.2d 309 (Ala.Crim.App. 1992). In Ex parte Trawick, 698 So.2d 162, 168 (Ala.Crim.App. 1997), we stated:
 "A juror need not be excused merely because he or she knows something of the case to be tried or has formed some opinions regarding the case. Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. In order to justify disqualification, a juror must have more than a bias or an opinion as to the guilt or innocence of the accused; the bias or opinion must be so fixed that the juror cannot lay it aside and render a verdict based on the evidence presented in court."
(Citations omitted; emphasis added). R.T.'s responses to the questionnaire were prior to the general voir dire of the veniremembers. During general voir dire, the prosecutor asked the following question of all the veniremembers:
 "Is there anybody who already has a fixed opinion and your minds are made up as to whether he [Living] is guilty or innocent at this point?
"(No response.)"
(R. 465.) At no time during voir dire was R.T. questioned regarding the responses on his questionnaire; he never indicated that he could not be fair and impartial and decide the case based on the evidence. Because the record does not support a finding that R.T.'s opinions were so fixed that he could not lay them aside and render a fair and impartial verdict, we find no reversible error. See Minor v. State, 780 So.2d 707
(Ala.Crim.App. 1999) (no reversible error in a case where the trial court denied the challenge for cause based on the prospective juror's close relationship with the police because the relationship between the police and the prospective juror was not explored during voir dire; thus there was no evidence that the prospective juror could not be fair and impartial).
Living's next challenge for cause was with regard to C.B. In response to a question on the jury questionnaire concerning the presumption of innocence, C.B. stated, "I would have to be shown that the other party was completely innocent and that there was no provoking from the victim." (R. 607.) In addition, on voir dire C.B. indicated that she was related to Officer Randy Bates, the first officer to respond to the scene of the crime in this case. C.B. further indicated that she would believe the testimony of Officer Bates over the testimony of defense witnesses. (R. 580-81.)
C.B.'s statements were elicited in response to the jury questionnaire and during questioning by counsel for Living while conducting individual voir dire of C.B. However, the State sufficiently rehabilitated C.B. C.B. clearly stated to the trial court that she would obey the judge's instructions and consider the evidence presented by both parties. (R. 582.) Contrary to Living's argument on appeal, C.B.'s responses to the State's questions went beyond simply stating that she "would consider the evidence." Appellant's Brief, at p. 20. The question and answer in the following colloquy indicates that C.B.'s opinions were not so fixed that she could not be fair and impartial:
 "MR. FRY [prosecutor]: The question is not whether or not you would automatically believe Randy but whether or not you would listen to all of the evidence and not what the lawyers argue about *Page 1135 
the evidence. Would you listen to all of the evidence in your own mind to attempt to arrive at what you believe the truth is?
"THE JUROR: I would."
Because the trial court was able to observe C.B.'s demeanor and to hear her answers to all of the questions, there is no indication that the trial court abused its discretion by denying the challenge for cause as to C.B. See Oryang v. State, 642 So.2d at 987.
Living's next challenge for cause was made with regard to K.M. K.M. stated to the trial court that she would automatically vote for the death penalty if Living were found guilty. (R. 492.) When questioned by the trial court, K.M. stated that she could "probably" consider life imprisonment without parole, but that she would probably "go for the death penalty." (R. 492.) However, upon further questioning by the trial court, K.M. indicated that after hearing all of the evidence she could fairly consider either life without parole or the death penalty. (R. 493.) Based on the record we do not find that K.M. harbored a fixed opinion about sentencing. Therefore, the trial court did not commit reversible error when it denied the challenge for cause with regard to K.M.
Living's next challenge for cause was made with regard to M.B. M.B. indicated on his juror questionnaire that he "favor[ed] law enforcement testimony." (R. 611.) M.B. has several family members who work in law enforcement and he stated that he had "great faith" in law enforcement and the testimony of law enforcement officers. Based on M.B.'s responses on the juror questionnaire, Living contends that M.B. had a pro-law enforcement bias and a fixed opinion about the testimony of law enforcement witnesses. We disagree.
None of M.B.'s responses regarding law enforcement indicated that M.B. had an opinion about law enforcement testimony so fixed that he could not fairly and impartially return a verdict based on the evidence. In addition, as was the case with R.T., Living did not explore M.B.'s alleged law enforcement bias during voir dire. Because there was no evidence that M.B. could not fairly and impartially return a verdict based on the evidence, we find no reversible error.
Living's next challenge for cause was made with regard to T.N. T.N. stated on his juror questionnaire that he did not "feel life in prison should be an alternative in a first degree murder." (R. 616.) T.N. also stated on the questionnaire that he did not believe that the public "should have to feed and house these people." (R. 617.) Living contends that T.N.'s responses indicated a clear bias and a fixed opinion that he should be sentenced to death. We disagree.
The foregoing statements do not indicate that T.N. would not listen to the law and the evidence and return a fair and impartial verdict. T.N. was not questioned by the defense about his responses on the questionnaire during general voir dire and there was no indication that T.N. could not return a fair and impartial verdict based on the evidence. Moreover, when the trial court asked if there were any veniremembers that would automatically vote for the death penalty, T.N. remained silent, thereby indicating that he could consider both sentencing alternatives. (R. 387-91). Thus, because T.N. never indicated that his opinion regarding the death penalty was so fixed that he could not return a fair and impartial verdict, we find no reversible error.
Living's next challenges for cause were made with regard to jurors E.R. and D.S. Living alleges that during voir dire *Page 1136 
both E.R. and D.S. stated that they would not consider intoxication as a defense or as a mitigating circumstance if he was convicted. While both jurors did express that they were opposed to intoxication as a defense, Living is incorrect in asserting that E.R. and D.S. stated that they would not consider intoxication if instructed to do so by the trial court.
In his brief, Living cites the following colloquy as evidence that E.R. and D.S. could not be fair and impartial when considering intoxication as a defense or mitigating factor:
 "MR. MOFFATT [Defense counsel]: Nobody is raising their hands. Can everyone here follow the Judge's instructions if he instructs you that if you determine Danny Living did take these pills that he could not form the intent to commit murder and you would find him not guilty? Is there anyone here who would follow that?
"(Juror responds.)
 "MR. MOFFATT: [E.R.], you are indicating no. This is not going to fly with you? Is that right?
"THE JUROR: That's right.
 "MR. MOFFATT: If you take pills or you do not take pills, if the Judge tells you that's something you have to consider, that's not going to be an excuse to you?
"THE JUROR: No. There are no excuses for your actions."
(R. 521.) E.R. also stated that he did not believe that the judge would instruct him to consider intoxication as a defense, and even if the judge did so, he would follow his own instincts. (R. 522.) D.S. agreed with the views expressed by E.R. (R. 524.)
Following this exchange, however, the record indicates that as the veniremembers were questioned further about intoxication it became apparent that they misunderstood the questions. (R. 527.) Living's attorney attempted to restate his questions concerning intoxication to clarify the issue for the veniremembers on two separate occasions. (R. 527, 531.) On the second occasion, the following took place:
 "MR. MOFFATT [Defense counsel]: Is there anyone here who if the Judge does tell you later that being under the influence is something that you should consider in determining guilt or in determining the sentence would not be able to follow that instruction and that you just don't think that that's ever going to be something that you would ever have to think about?
"(No response.)."
The record clearly indicates that, despite their earlier comments, both E.R. and D.S. agreed that they could listen to the trial court's instructions regarding intoxication and that their opinions were not so fixed that they would ignore those instructions. The trial court was in the best position to determine whether E.R. and D.S. had a fixed opinion about the viability of the intoxication defense. We find no abuse of discretion in its decision to deny the challenges for cause with respect to those prospective jurors.
Living's last challenge for cause was made with regard to M.B. M.B. stated on her juror questionnaire that she had been a recent victim of a theft and that Investigator Stanley McNatt, a witness for the State, was investigating the case. (R. 578.) M.B. also stated that the prosecutor's assistant would be prosecuting her theft case, that she was related to Officer Randy Bates, and that she would favor law enforcement witnesses. (R. 623-25.)
Based on the foregoing information, Living argues that M.B. was intermingled with the prosecution and that she had an absolute bias in favor of law enforcement. We disagree. M.B. was questioned on *Page 1137 
individual voir dire about her relationship to Officer Bates and about the effect of her being a victim of theft. M.B. unequivocally stated that neither her relationship to Officer Bates nor her status as a victim of a crime would affect her ability to be fair and impartial to all parties. (R. 577-79.) The trial court did not commit reversible error when it denied the challenge for cause as to juror M.B.
 VI.
Living contends that the trial court erred (1) by denying a motion to suppress a statement he made to investigators; and (2) by not suppressing evidence obtained pursuant to a search. The testimony elicited during the suppression hearing showed that after Living was arrested he was taken to the Limestone County Sheriff's Department. While there, Living signed a consent form, consenting to a search of his home. After the consent form was signed, a tape recorder was turned on and Sheriff Blakely read Living his Miranda rights. At that point Living stated that he wanted an attorney. As a result, Sheriff Blakely stopped talking to Living and the tape recorder was turned off. Living contends that he did not voluntarily initiate communication with the police.
The uncontradicted evidence presented at trial was that after the tape recorder was turned off, Living immediately began making unsolicited statements concerning the shooting. Then Sheriff Blakely questioned Living regarding Living's remarks; however, the tape recorder remained turned off during the questioning. During the conversation between Sheriff Blakely and Living, Living made several inculpatory statements.
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981), the United States Supreme Court held that when a criminal suspect invokes his right to have counsel present during a custodial interrogation, that person can not be subject to further interrogation until counsel has been made available unless the person initiates further communication with the police.See also Ex parte Cothren, 705 So.2d 861, 863 (Ala. 1997).
After he invoked his right to counsel, Living made the following initial statement: "How is Missy (Melissa)?" "I messed up." In Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830,77 L.Ed.2d 405 (1983), the United States Supreme Court held that while it would not be "desirable to build a superstructure of legal refinements around the word `initiate,'" a question that shows "a willingness and a desire for a generalized discussion about the investigation" will fulfill the initiating-communication requirement of Edwards. See Oregon v. Bradshaw,462 U.S. at 1045-46 (the defendant's question, "Well, what is going to happen to me now," was held to be an initiated communication with the police).
In this case, Living clearly initiated communication with the law enforcement officers. The State's evidence showed that Living asked the initial questions to the investigators and Sheriff Blakely, but before anyone responded, he proceeded to talk about specific aspects of the crime without awaiting any response to his questions or statements. (R. 100-03, 137-38.) Only after Living had talked about the crime for several minutes did Sheriff Blakely question him about his responses and attempt to further develop statements Living made. (R. 104.) Because Living initiated communication with the investigators by asking questions and volunteering information about the crime, there was no violation of the Edwards rule. *Page 1138 
The next inquiry is "whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." See Oregon v. Bradshaw,462 U.S. at 1044-45 (citing Edwards v. Arizona, 451 U.S. at 486 n. 9). This determination depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Oregon v. Bradshaw, 462 U.S. at 1046
(citing North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755,60 L.Ed.2d 286 (1979)).
Living raises two main arguments for the proposition that he did not voluntarily waive his right to counsel after initiating communication with the investigators. First, Living asserts that once he invoked his right to counsel, Sheriff Blakely began reading a written statement from a witness in the case that contained evidence incriminating him. Thus, Living contends that the disclosure of the incriminating evidence created an "inherently compelling psychological force" that rendered his statement involuntary. Appellant's Brief, at p. 29.
The record does not indicate that Sheriff Blakely disclosed any incriminating evidence to Living in order to get him to make a statement. In fact, while the record does indicate that Sheriff Blakely may have read the statement of David Cluxton in Living's presence, there was no evidence that the Sheriff read Cluxton's statement to Living. The record indicates the following colloquy took place during the suppression hearing:
 "Q: Now, let me go on with your statement. Sheriff Blakely was reading a statement which had been taken from David Alton Cluxton. How long after you were putting things away did Sheriff Blakely start reading the statement?
"A: I believe it was while I was putting things away.
"Q: Five minutes or less?
"A: Immediately.
"Q: And you heard him read that statement?"
 "A: I don't recall hearing him read the statement. I believe I remember him sitting down like this and reading it. (Indicating.) That's all I remember.
"Q: You could see him reading it?
"A: Yes, sir.
"Q: Was he reading out loud?
"A: I could not tell you. I don't know."
(R. 295.) There is no evidence that Sheriff Blakely mentioned any particular part of Cluxton's statement to Living or that Living sought to refute allegations in Cluxton's statement when he began talking about the killings.
Living's second contention is that he was so intoxicated at the time he made the statements to the investigators that he was unable to voluntarily waive his previously invoked right to counsel. "Unless intoxication, in and of itself, so impairs a defendant's mind that he is `unconscious of the meaning of his words,' the fact that the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession." Smithv. State, 727 So.2d 147, 163 (Ala.Crim.App. 1998) (citing Carr v.State, 545 So.2d 820, 824 (Ala.Crim.App. 1989)).
The testimony elicited during the suppression hearing indicated that Living appeared to be under the influence of alcohol and/or drugs when he was read his Miranda warnings. However, all the witnesses *Page 1139 
testified that based on their observations, Living was coherent and articulate, and he understood the nature of his rights when he made his statements to the investigators. The record does not reveal any evidence suggesting that at the time Living made his statements, he did not understand the meaning of his words. Thus, given the totality of the circumstances, Living waived his previously invoked right to counsel.
With regard to the consent-to-search form, Living argues that he was unable to give a voluntary consent to search his property because of his level of intoxication. The question of whether a consent to search is voluntary is a question of fact for the trial court to decide based on the totality of the circumstances. Benderv. State, 687 So.2d 219, 221 (Ala.Crim.App. 1996). The evidence adduced at the suppression hearing indicates that although Living had the smell of alcohol on his breath at the time, he appeared calm and sober, and he understood what was going on when he signed the consent form. (R. 131.) In fact, Sheriff Blakely testified that Living was not intoxicated when he consented to the search of his property. Based on the totality of the circumstances, we conclude that Living's consent to search was given voluntarily.
 VII.
Living contends that the trial court erred in failing to grant a mistrial based upon (1) allegedly impermissible rebuttal argument; (2) the alleged impermissible use of photographs during closing argument; and (3) allegedly improper comments during closing argument. "A prosecutor's closing statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v.State, 735 So.2d 1244, 1253 (Ala.Crim.App. 1999). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead v. State,585 So.2d 97, 107 (Ala.Crim.App. 1989) (quoting Darden v.Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).
Living alleges that the State's rebuttal closing argument was impermissible because during the rebuttal argument the State played a recording of an emergency 911 call that, according to Living, in no way rebutted, refuted, or in any way addressed any issue raised by the defense. We disagree. During closing argument Living's attorneys argued that Living did not intend to kill the victims, but instead, that Living either recklessly or accidently killed the victims. (R. 1358-81.)
By playing the recording of the 911 tape during its rebuttal argument, the State showed that it was one of the victims, Melissa Thornton, who called for help after the shooting not Living. Thus, the State countered Living's argument that at least one of the shootings was unintentional, by in essence asking whether someone would unintentionally shoot another person and then not try to help them. We find that the State's use of the 911 tape was appropriate and that the trial court properly denied Living's motion for a mistrial on this ground.
Living alleges that the State improperly used two 8 x 10 color photographs of the victims during closing argument. This issue has not been properly preserved for review. At no time during the State's closing argument did Living object to the prosecutor's use of the photographs. (R. 1339-58, 1395-1405.) After closing arguments for both sides, but before the jury was instructed, Living moved *Page 1140 
for a mistrial and raised this issue for the first time. (R. 1407.) A motion for a mistrial compensates for a lack of an objection only if the motion follows immediately after the grounds which are the bases for the motion. Robinson v. State, 584 So.2d 533,538 (Ala.Crim.App. 1991).
Moreover, while the record indicates that the prosecutor made references to the two victims during his closing argument, the record does not reflect that the prosecutor used the photographs as demonstrative aids or showed them to the jury. As the prosecutor talked about the victims, the record cites the term "indicating," but it does not reflect what the prosecutor was indicating. (R. 1353.) "This Court cannot predicate error on matters not shown by the record nor can we presume error from a silent record. It is the appellant's duty to provide this Court with a complete record on appeal." See Rutledge v. State,745 So.2d 912, 919 (Ala.Cr.App. 1999) (citing Stegall v. State,628 So.2d 1006 (Ala.Crim.App. 1993), and McCrary v. State,629 So.2d 729 (Ala.Crim.App. 1993)).
Living alleges that the State made improper comments during closing argument when the prosecutor stated to the jury that it should "send them a message." The following occurred during the rebuttal closing argument by the prosecutor:
 "[MR. FRY]: You know, I agree with a lot of what Mr. Simpson said about justice. I believe, ladies and gentlemen, that other murders will happen here, but I'm not satisfied that there's nothing we can do to stop it or prevent it. If I were, I wouldn't be here. If I were satisfied that, well, there's nothing we can do, no, Kristi, let's all go back to school and become stockbrokers and farmers or just go fishing or something. We're wasting our time. There's nothing we can do. There's no reason to make arrests. There's no reason to have juries. There's no reason to have trials because there's nothing we can do. Let's go home and lock the doors. Don't go outside at night. I think there is something we can do. We can be responsible and have spines. We can stand up for what is right and not be confused by razzle dazzle.
"What was it like — what was it like for —
 (Whereupon, Mr. Fry begins playing a recorded cassette tape.)
". . . .
 "MR. FRY: That doesn't have to happen here. We don't have to tolerate that here. If you believe he's guilty of the crime after the Judge gives you the instructions, send them a message."
(R. 1402-04.) This Court has consistently held that urging the jury to return a verdict so as to punish crime, protect the public from similar offenses, and deter others from committing similar offenses is not improper argument. See Sockwell v. State,675 So.2d 4, 35 (Ala.Crim.App. 1994); Freeman v. State, 776 So.2d 160
(Ala.Crim.App. 1999).
Furthermore, we have held that a "trial court's immediate curative instruction concerning the prosecutions's comments creates a prima facie presumption against error." Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___ (Ala.Crim.App. 1999). As soon as the prosecutor in the present case made the "send a message" statement, Living objected, and the trial court stated: "I will charge this jury that you are to determine the guilt or innocence based on the facts of this case." (R. 1404.)
Viewed in the context in which they were made, the prosecutor's "send them a message" comment was clearly an *Page 1141 
appeal for law enforcement and was, therefore, proper. Even if the comment had been improper, the curative instruction given by the trial court was sufficient to prevent any reversible error. Thus, based on the foregoing, the trial court did not err when it denied Living's motion for a mistrial.
 VIII.
Living contends that the verdict is not supported by the sufficiency of the evidence and that it is contrary to the great weight of the evidence. Weight of the evidence refers to whether the State's evidence is palpably less persuasive than the defense's evidence. Parker v. State, 395 So.2d 1090, 1103
(Ala.Cr.App. 1980).
The issue of the weight to be afforded the evidence, is a question for the jury and this Court will not invade the province of the jury by reweighing the evidence. Pearson v. State,601 So.2d 1119, 1124 (Ala.Crim.App. 1992). When determining whether there is sufficient evidence to sustain a conviction, this Court must ascertain whether any evidence presented to the trial court tended to indicate the accused's guilt. Sartin v. State,601 So.2d 1142, 1144 (Ala.Crim.App. 1992). The State's evidence must be "received as true [,] . . . viewed in the light most favorable to the State [,] . . . [and] accorded all legitimate inferences arising from the evidence presented." Id.
Moreover, a conviction will not be disturbed on appeal on the grounds of insufficiency of evidence "unless, allowing all reasonable presumption for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it was wrong and unjust."Jackson v. State, 516 So.2d 726, 753 (Ala.Crim.App. 1985). To sustain a conviction in the present case, the State had to prove (1) that Living intentionally caused the deaths of Jennifer Living and Melissa Thornton; and (2) that the murder of both victims was the result of one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala. Code 1975.
Clearly, there was sufficient evidence presented to the jury to support Living's conviction. Contrary to Living's assertions on appeal, there was sufficient evidence presented to the jury to show that he intentionally shot Jennifer Living and Melissa Thornton and that he did so pursuant to one course of conduct. According to Living's own statement, he regretted shooting Melissa, but he shot her nonetheless because she was "bitching at him too." In addition, Chad Thornton's testimony that the gunshots were "constant and at the same time," indicates that the two victims were shot pursuant to one course of conduct. Thus, we conclude that the State presented sufficient evidence of the murder of two persons pursuant to one course of conduct and that the trial court did not err in denying Living's motion for a judgment of acquittal.
 IX.
Living contends that the trial court erred in denying his motion to prohibit uniformed members of the sheriff's department from sitting at the prosecution table during voir dire, jury selection, and trial. On appeal, Living specifically alleges that the presence of uniformed officers sitting with the prosecution during all aspects of the trial was highly prejudicial and fundamentally unfair, and that it prevented his receiving a fair and impartial trial. This issue is without merit.
"Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of the trial court to allow a sheriff, police chief or similarly *Page 1142 
situated person who will later testify to remain in the courtroom during trial." Carroll v. State, 599 So.2d 1253, 1261
(Ala.Crim.App. 1992). In Stewart v. State, 601 So.2d 491
(Ala.Crim.App. 1992), this Court addressed an issue very similar to the one in the instant case. In Stewart, a police investigator was excepted from the rule requiring exclusion of all witnesses from the courtroom and was allowed to sit at the prosecution's table.
In addition to being allowed to sit at the prosecutor's table, the police investigator in Stewart was allowed to testify from the prosecutor's table. Id. at 501. This Court held inStewart that the appellant was not prejudiced by allowing the investigator to testify from the prosecutor's table and noted that "the jury knows that police officers investigate cases and assist the prosecution." Id.
Because the testimony of officers from the prosecutor's table does not prejudice a defendant, clearly an officer's mere presence at the table cannot be deemed so prejudicial as to constitute reversible error. The trial court did not abuse its discretion by denying Living's motion to exclude law enforcement officers from sitting at the prosecution's table.
Living also argues that it was fundamentally unfair for law enforcement officers to help the prosecutor select the jury. This issue has not been properly preserved for review. At trial, Living made the following argument:
 "MR. SIMPSON: . . . [W]e're asking that a police officer, investigator, or anybody in uniform or out of uniform not be allowed to sit at the table with the prosecutor. Especially in this case, we ask that the Sheriff or the D.A.'s investigator not be allowed to sit at the table because the Sheriff is in a high profile race and he's going to be 14 days later sitting at a table. We also have the same objection to the D.A's investigator. Bobby Smith, I know him. I think the world of him. Nevertheless, he's a well known person in this community and might influence the jury. We ask that those type of people not be allowed to sit at the table with the State."
(R. 257). Living never objected on the grounds that it was fundamentally unfair for law enforcement officers to help the State during voir dire. Thus, Living is now raising different grounds on appeal than he raised in the trial court. "The trial court cannot be placed in error on grounds not asserted. . . . The court was required to pass only upon the ground of the objection specified by the appellant and those not announced are waived."Greenhill v. State, 746 So.2d 1064, 1071 (Ala.Crim.App. 1999). For the foregoing reasons, the trial court did not commit reversible error with respect to this issue.
 X.
Living contends that the trial court erred in refusing to grant his motion for a change of venue. Living argues that he was unable to receive a fair trial in Limestone County because the sheriff who took his confession was running for election and was also helping select the jury. This argument is without merit.
In Neal v. State, 731 So.2d 609 (Ala.Crim.App. 1997), this Court recited the following standard for determining whether a motion for a change of venue is due to be granted:
 "`In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600
(1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App. *Page 1143 
1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298
(Ala.Cr.App. 1978).'"
731 So.2d at 612 (quoting Ex parte Grayson, 479 So.2d 76 (Ala. 1985)). In addition, a trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Joiner v. State,651 So.2d 1155 (Ala.Crim.App. 1994).
In the present case, Living presented no evidence supporting his allegation that he was prejudiced by the fact that his trial took place during an election year and that the sheriff's political notoriety would affect the trial. (R. 235-43.) Thus, because Living presented no evidence to support these allegations, the trial court did not abuse its discretion, and consequently did not err, in denying his motion for a change of venue.
 XI.
Living's last contention is that the trial court erred in admitting into evidence photographs of the victims taken while they were alive. Living argues that the photographs were highly prejudicial and immaterial to any disputed fact, including identity, because he stipulated to the identity of the victims. This argument is without merit.
The determination of whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice is made by the trial court, and this Court will not disturb such a determination unless there is a clear abuse of that discretion. Ward v. State, [Ms. CR-98-0800, February 4, 2000] ___ So.2d ___ (Ala.Crim.App. 2000). In Minor v. State, 780 So.2d 707
(Ala.Crim.App. 1999), we stated:
 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant factor or evidence or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence."
(Citation omitted). In the present case, the photographs of the victims while they were alive were clearly relevant to identity, regardless of the fact that Living stipulated to the issue of identity. See Jolly v. State, 395 So.2d 1135, 1141 (Ala.Crim.App. 1981). In Jolly, this Court held:
 "`It generally is agreed that the photograph of the victim of the homicide, taken before the alleged murder, is admissible for the purpose of identification. This is usually admitted in connection with the testimony of a witness who saw the alleged deceased at the time of the killing and who is called upon to identify the deceased as the person in the photograph. The foregoing decisions which admit the victim's photograph into evidence for the purpose of identification are applicable even though there exists no dispute over the identity of the decease.'"
395 So.2d at 1142 (citation omitted) (quoting C. Gamble, McElroy'sAlabama Evidence, § 2.07.01(2) (3rd ed. 1977)). See also Burgessv. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___ (Ala.Crim.App. 1998). For the foregoing reasons we find that the trial court did not abuse its discretion by admitting the photographs into evidence.
 XII.
The record reveals that Living was indicted and convicted for two counts of capital murder for the intentional killing *Page 1144 
of two or more persons by one act or pursuant to one scheme or course of conduct. See § 13A-5-40(a)(10), Ala. Code 1975. Each count was identical, except the order of the names was reversed. (C. 10-13.) However, Living was only given one sentence for both counts. (C. 353-60.) Living's convictions under both counts allowed him to be convicted twice for the two murders, in violation of the Double Jeopardy Clause. In Knight v. State, 675 So.2d 487,496-97 (Ala.Crim.App. 1995), this court stated:
 "In United States v. Dixon, 509 U.S. 688, (1993), the United States Supreme Court addressed the scope of the Double Jeopardy Clause:
 "`The Double Jeopardy Clause . . . provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., Amendt. 5. This protection applies both to successive punishments and to successive prosecutions for the same criminal offense. See North Carolina v. Pearce, 395 U.S. 711 (1969). . . .
". . .
 "`In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the "same-elements" test, the double jeopardy bar applies. The same-elements test, sometimes referred to as the "Blockburger" test, inquires whether each offense contains an element not contained in the other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution.'"
(Some Citations omitted).
In the instant case, neither Count I nor Count II contains an element not found in the other; therefore Living's conviction as to both counts violated the Double Jeopardy Clause. Thus, we hereby remand this case to the trial court and order that court to vacate one of the two convictions. Due return shall be made to this court within 30 days.
REMANDED WITH INSTRUCTIONS.*
Long, P.J., and McMillan and Baschab, JJ., concur; Fry, J., recuses himself.
* Note from the reporter of decisions: On August 18, 2000, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On October 27, 2000, that court denied rehearing, without opinion. On April 27, 2001, the Supreme Court denied certiorari review, without opinion (1000310).
[1] One issue on appeal is whether Living's conviction for two counts of capital murder under § 13A-5-40(a)(10), Ala. Code 1975, violates the Double Jeopardy Clause. See our discussion in Part XII of this opinion.